Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that plaintiff's motion to remand be and is denied.

IT IS FURTHER ORDERED that defendant's motion to dismiss be and is granted, and plaintiff's complaint be and is dismissed with prejudice.

IT IS FURTHER ORDERED that defendant's motion in the alternative for summary judgment be and is denied as moot.

**MISSOURI KNIGHTS OF THE KU KLUX KLAN, et al., Plaintiffs,**

v.

**KANSAS CITY, MISSOURI, Defendant.**

No. 89–0067–CV–W–5.

United States District Court, W.D. Missouri, W.D.

June 15, 1989.

Larry O. Denny, Kansas City, Mo., Stephen L. Pevar, American Civ. Liberties Union, Denver, Colo., Robert Perry, Media Law Clinic, NYU, New York City, Joseph Van Eaton, Spiegel & McDiarmid, Washington, D.C., for plaintiffs.

William D. Geary, Law Dept., Kansas City, Mo., for defendant.

## MEMORANDUM OPINION

SCOTT O. WRIGHT, Chief Judge.

On May 26, 1989, this Court entered its order denying defendant's motion to dismiss. This memorandum articulates the underpinnings of that order.

On January 25, 1989, the plaintiffs herein filed their complaint in this action. Plaintiff Missouri Knights of the Ku Klux Klan ["Missouri Knights"] is an unincorporated association of individuals who espouse a "racialist" viewpoint; they believe that ethnological races should not mix. Plaintiff Allen T. Moran is the highest ranking person within the Missouri Knights.

Plaintiff Kent Teel is an independent producer of video programming in Kansas City. Mr. Teel has produced numerous video programs and alleges that he was thwarted from airing additional programs when Kansas City authorized the elimination of the public access channel. Plaintiffs Ellen B. Ryder and Barbara Ann Roberts subscribe to cable service in Kansas City and regularly watched video programs on the public access channel.

Defendant Kansas City, Missouri ["Kansas City"] is a municipality within the State of Missouri. Kansas City's Mayor is Rich-

ard L. Berkley and its legislature is the Kansas City City Council. Pursuant to state law, the City Council may award, amend, renew and revoke franchises to provide cable services in Kansas City.

## I. *Factual Allegations*

In 1972, then Mayor of Kansas City, Charles B. Wheeler, Jr., created an Advisory Committee to explore community interest in cable TV and to make recommendations concerning a cable franchise. This committee issued a citizens' guide in 1973 detailing the various benefits of cable television.

In early 1977, a cable operator applied for a cable franchise to serve northern Kansas City. This application prompted Mayor Wheeler to reactivate the Advisory Committee, although it was renamed the Study Committee on Cable TV. The Study Committee then solicited applications for cable franchises to serve the Kansas City area. In February, 1978, the Study Committee heard presentations from several companies interested in a cable franchise, including American Telecommunications and Communications Corporation ("ATC") then and now the second largest "multiple system operator" ("MSO")—corporate conglomerates which own multiple cable systems.

In September, 1978, three companies formally applied for cable franchises in Kansas City. ATC applied for a cable franchise to serve the entire city; another operator applied for a franchise to serve the northern portion of Kansas City; and a third operator applied for a franchise to serve the southern portion of Kansas City. To bolster its application, ATC emphasized its commitment to public access and support services.

In December, 1978, the Study Committee recommended the grant of an exclusive franchise to ATC's proposed subsidiary, American Cablevision of Kansas City ("ACV"), and rejected the idea of overlapping and competing franchises. In January, 1979, the Kansas City City Council passed an ordinance which awarded a 15–year franchise (until 1994) to ACV.

Under the terms of the 1979 ordinance, ACV was required to offer a cable package of 32 channels, four of which were to be "public channels" reserved for use by members of the public at no cost. Two of the four channels were reserved for educational programming, a third for cultural programming, and a fourth channel for other public access use. None of the public channels could be deleted without the prior written approval of the Kansas City City Council. ACV was also required to provide public access producers with production equipment facilities and staff assistance free of charge. Even though ACV was required by the franchise to create one public access channel for cultural programming and another channel for general public access use, ACV created only one channel, Channel 20, for both uses.

In August, 1987, several representatives of the Missouri Knights requested weekly public access time on Channel 20 to air a series of 45 programs collectively entitled "Race and Reason" and hosted by Tom Metzger, a nationally known organizer for the Ku Klux Klan and former Grand Dragon of the California Knights. The programs presented political and social commentary from a "racialist" point of view.

This request for access was denied by ACV officials, who advised the Missouri Knights that only locally produced video programming could be presented during public access time on Channel 20. The complaint, however, alleges that no such rule actually existed and non-local productions frequently were aired during public access time on Channel 20. Nevertheless, in order to comply, the Missouri Knights agreed to air locally produced programming. ACV officials then advised the Missouri Knights that before its members could use Channel 20's facilities and equipment, they would have to be trained by ACV personnel in their use. The complaint alleges this requirement was merely a pretext. Nevertheless, the Knights agreed to receive the required training.

On January 25, 1988, a local group named Concerned Citizens for Decency held a press conference at Kansas City City

Hall to urge ACV and the City Council to deny any requests by the Missouri Knights for public access time on Channel 20. The complaint alleges that ACV's Director of Public Affairs attended the press conference and stated publicly that ACV did not want to grant the Missouri Knights' request.

The complaint asserts that during the next few months, ACV and Kansas City officials devised a plan by which Channel 20 would be eliminated and a new channel would be created. This channel would be subject to ACV's editorial control. However, the complaint alleges that ACV would continue to air, without editorial interference, the programs that had been previously shown on Channel 20 and ACV would reserve its editorial powers for "extremist" groups, including the Missouri Knights.

On April 22, 1988, the president of ACV, Robert B. Niles, sent a letter to the Kansas City City Council in which he explained that ACV was powerless to prohibit programming that is "morally offensive ... to the City Council's constituents...." Mr. Niles stated that "[Councilman] Sharp has suggested to us" that the Council eliminate the public access requirement of the franchise. In return, the complaint alleges, if a resolution to that effect was passed, ACV would increase its local programming and accommodate "present access users." A few hours later, Councilman Sharp introduced a resolution which permitted ACV to delete the cable channel if it so desired.

This resolution states in pertinent part: WHEREAS, Section 21(c) of the franchise states that none of the public channels will be deleted without written approval of the City; NOW THEREFORE, BE IT RESOLVED BY THE COUNCIL OF KANSAS CITY:

A. That in accordance with Section 21(c) of the cable television franchise ordinance the City Council hereby authorizes American Cablevision to delete the public access channel.

B. That the permission granted herein may be revoked by the City Council at its discretion.

The complaint alleges the sole legislative purpose of Resolution No. 62655 was to prevent the Missouri Knights from cablecasting its programs because of their viewpoint.

## II. *The Complaint*

Plaintiffs' complaint is comprised of four counts. Count I alleges that Resolution No. 62655 violates the First and Fourteenth Amendments to the United States Constitution because the purpose for enacting Resolution No. 62655 was to suppress the "racialist" viewpoint of the plaintiff Missouri Knights. Relief is sought pursuant to 42 U.S.C. § 1983.

Count II is a claim of first impression. Plaintiffs allege that, because Kansas City has created a monopoly cable franchise, it is constitutionally obligated to require the franchisee to create and operate at least one public access channel. Consequently, Resolution No. 62655, which eliminated the franchisee's only public access channel, violates the First and Fourteenth Amendments to the United States Constitution. Relief is sought pursuant to 42 U.S.C. § 1983.

Count III and IV are alleged in the alternative. Count III alleges that the public access channel, in actuality, was never deleted. Rather, the City authorized ACV to retain the public access channel, but to censor it. The assignment of editorial control over a public forum, the complaint asserts, violates the First and Fourteenth Amendments with respect to video producers (such as plaintiffs Teel and Moran) and for viewers who wish to watch programs on that forum (such as plaintiffs Ryder and Roberts). Count IV, based on the allegations above, alleges that Kansas City has violated § 611(e) of the Cable Communications Policy Act of 1984 which provides "a cable operator shall not exercise any editorial control over" cable channels dedicated to public access use. 47 U.S.C. § 531(e).

Plaintiff requests this Court issue declaratory relief pursuant to 28 U.S.C. § 2201 and 2202, declaring that Kansas City Resolution No. 62655 violates plaintiffs' right under the First and Fourteenth Amendments and is, therefore, invalid and, fur-

ther, declaring that Channel 30, although now labeled a "community programming channel," remains as a matter of law a public access channel and, consequently, (a) is not subject to ACV's editorial control, and (b) Kansas City, therefore, must enforce its original public access franchise requirements. Finally, plaintiffs request this Court issue injunctive relief pursuant to Fed.R.Civ.P. 65 enjoining Kansas City, and all persons acting in concert with the City, from any further violation of plaintiffs' First and Fourteenth Amendment rights regarding equal access to the public access channel.

### III. *Standard of Review*

The facts alleged in plaintiffs' complaint and outlined above are assumed to be true for the purpose of deciding Kansas City's motion to dismiss. *Central Telecommunications, Inc. v. City of Jefferson City*, 589 F.Supp. 85, 89 (W.D.Mo.1984). *See also City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 493, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986). A claim for relief should not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitle him to relief.' " *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

### IV. *Analysis*

Defendant's contention with respect to the plaintiffs' complaint will be addressed seriatim. As to Count I, defendant initially argues that because Channel 20 was a part of ACV's cable system, it was at all times private property. Consequently, the argument continues, the proper inquiry is whether Channel 20 is private property that has been dedicated to public use. *See, e.g. Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company-owned town had characteristics of municipality and, therefore, could be analogized to public property). Defendant argues that it is obvious from the facts alleged that Channel 20 is not analogous to a municipality as was the property in *Marsh* and, accordingly, judgment should be entered on

Count I in its favor as a matter of law because plaintiffs do not have a First Amendment right to speak on private property.

■ The Court believes defendant's emphasis on where title to Channel 20 is vested is unreasonably constrained. Whether a particular piece of property is to be considered public for the public forum analysis has never rested entirely on the status of its owner. Rather, the inquiry is whether the property is owned or *controlled* by the government. *See, e.g. United States Postal Service v. Council of Greenburgh Civic Assoc.*, 453 U.S. 114, 101 S.Ct. 2676, 2685 & n. 7, 69 L.Ed.2d 517 (1981). In *Postal Service*, there was no question but that the mailboxes at issue were privately owned. Nevertheless, once installed, they became part of the "[P]ostal Service's nationwide system for the delivery and receipt of mail." *Id.* 101 S.Ct. at 2684. They effectively fell within the sphere of government control and any restriction of speech in that forum by the government was subjected to First Amendment analysis. *See also Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (government was lessee and hence in control of property, irrespective of fact that title to theatre was in private hands).

■ The complaint alleges that ACV was required to segregate and maintain a portion of its cable band for public use. Channel 20 was created as a vehicle for public expression. ACV could not exercise editorial control over the channel; ACV could not eliminate the channel. Access to Channel 20 was guaranteed to the public on a first-come, first-serve basis and could not be denied on the basis of the viewpoint of the message, assuming the message was not otherwise legitimately subject to censorship. Ultimate control over the channel rested with the City Council who could, at their discretion, authorize ACV to eliminate the channel. Further, even though the Council has authorized Channel 20's elimination, the Council may require it be re-established at its discretion. The Court believes that if the allegations in the plain-

tiffs' complaint prove true, Channel 20 was a public forum.

The next issue is whether Channel 20 was a traditional public forum or a designated public forum. Defendant contends that Channel 20 was, at best, properly characterized as a designated public forum. The City further argues that because there is no requirement to maintain a designated public forum, there can be no constitutional violation for eliminating one. The Court will assume for the sake of argument that Channel 20 was a designated public forum. Nevertheless, defendant's conclusion does not necessarily follow.

■■■ It is true that there is no obligation to indefinitely maintain a designated public forum. However, the Constitution forbids a state to enforce exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); *Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976). Whether the exclusion is accomplished by individual censorship or elimination of the forum is inconsequential; the result is the same. A state may only eliminate a designated public forum if it does so in a manner consistent with the First Amendment. The complaint alleges Channel 20 was eliminated to censor the viewpoint of the Missouri Knights. At this stage of the proceedings, that is sufficient.

The City's final arguments are necessarily intertwined and will be addressed concurrently. The City contends that the legislative motive behind Resolution 62655 is not a proper inquiry for this Court. Further, the City contends Resolution 62655 is content-neutral on its face. Consequently, the City argues that because the resolution does not discriminate against speech on the basis of the content or viewpoint of the speech, and because this Court may not inquire as to any illegitimate motive the Council may have had in enacting the resolution, the resolution, as a matter of law, does not run afoul of the First Amendment.

The Court cannot adhere to either of the above premises.

■■■ There has been much confusion in these proceedings surrounding "legislative purpose" and "legislative motive." They are not synonymous, although the distinction has not always been made clear in the cases on the issue. Legislative motive or, more specifically, the motive an individual legislator has for voting for a particular piece of legislation is irrelevant and will not be grounds to invalidate an otherwise constitutional law or resolution. *See, e.g. United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968).

However, legislative motive should not be confused with legislative purpose. The latter is an essential inquiry in determining if a particular governmental restriction of speech is justified under the applicable rule of decision. The phrase "legislative purpose" is used interchangeably with "governmental interest" or "legislative interest" but nonetheless simply describes the legitimate interest of the legislature that is being advanced by the subject legislation. Indeed, in *O'Brien*, the case the City cites for its assertion to the contrary, the Court analyzed the stated purpose or interest sought to be advanced by the statute and measured it against the statute's restriction of speech. The governmental purpose or interest advanced by Resolution No. 62655 is a relevant inquiry and will be investigated by this Court in its analysis of the resolution's constitutionality. Why any particular councilman voted for the resolution, however, will be irrelevant to the issue of the resolution's constitutionality.

■■■ Likewise, the City's argument surrounding the alleged "content-neutrality" of the resolution is inapposite. Initially, it should be noted that if the plaintiffs' allegations prove true, we are talking about viewpoint-based discrimination, not content-based discrimination. Content-based discrimination is censorship that does not favor either side of a controversy, such as a total ban on discussion of racial topics. *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). Viewpoint-based discrimination, on the other

hand, excludes the expression of certain points of view from the market place of ideas, *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984), such as banning "racialist" speakers from expressing their viewpoint. The latter is implicated by these allegations. Consequently, the City's argument will be interpreted as stating its resolution is "viewpoint-neutral."

Nevertheless, the argument is premature. The plaintiffs have alleged that the resolution constitutes viewpoint-based discrimination and that allegation—at this stage of the proceedings—carries the day. Further, this allegation cannot be defeated by a mere facial reference to the text of the resolution. Whether a particular resolution or statute is viewpoint-neutral is not totally a question of its text but also concerns its justification. *Boos v. Barry,* 108 S.Ct. at 1163; *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). If the purported governmental interest of the City Council in enacting the resolution was to prevent the plaintiffs from expressing their view, then the resolution will be viewpoint-based, irrespective of the neutrality of the text. Cf. *Renton,* 106 S.Ct. at 929 (ordinance that was content-based on its face found content-neutral because it was justified without reference to content of regulated speech). *See also Taxpayers for Vincent,* 104 S.Ct. at 2128 ("[s]ome purported interests—such as a desire to suppress support for a minority party or unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas— ... are so plainly illegitimate that they would immediately invalidate the rule."). Such an inquiry requires further development of the record.

■ Although unnecessary to today's decision, the Court will address the City's assertion that if the resolution is viewpoint-neutral, it is *per se* constitutional. Even if further inquiry reveals the resolution to be justified without reference to the viewpoint of the plaintiffs, the inquiry will not end. Because the resolution limits speech, the resolution still must pass muster under the

analysis for viewpoint-neutral restrictions outlined in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *O'Brien* sets forth the appropriate framework for reviewing viewpoint-neutral regulations:

[A] government regulation is sufficiently justified if it is within the Constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* 88 S.Ct. at 1679.

In short, even if the resolution is assumed to be viewpoint-neutral, the City would not be entitled to judgment as a matter of law. The question of whether the incidental restriction on speech was no greater than necessary to achieve the City's interest will require resolution. The City's motion to dismiss Count I is denied.

Likewise, as to Count II, the City's motion must be denied. Although the City raises several arguments that may be dispositive, the Court believes the viability of Count II must be measured against a fully developed record. *See Central Telecommunications, Inc. v. TCI Cablevision, Inc.,* 800 F.2d 711, 716 (8th Cir.1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987) ("We make clear ... that we are unwilling to decide any question ... on which there has not been a full development of the record.").

■ As to Counts III and IV, the City initially contends the allegations will not support a finding of state action so as to implicate the Constitutional rights plaintiffs allege have been violated. The City argues that the allegations in these counts assail actions by ACV, not the City. Plaintiffs allege that in enacting Resolution No. 62655, the Kansas City City Council "relied upon and was induced by an assurance from ACV to retain the existing public access programs and to prevent the Missouri Knights from having equal access to a cable forum." The allegation that the

City Council and ACV engaged in joint action designed to suppress free speech states a cognizable claim under the state action doctrine. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970) (private party's joint participation with a state official in a conspiracy to discriminate constitutes state action).

The City next contends that Count IV must be dismissed because the plaintiffs have no express cause of action under 42 U.S.C. § 1983 for violations of Section 611 of the Cable Act. Section 1983 expressly provides that "[e]very person who, under color of any statute ... of any state...., subjects or causes to be subjected any citizen ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law [or] suit in equity." 42 U.S.C. § 1983. This provision is a vehicle to enforce substantive rights created by federal statute against persons violating such rights under color of state law. *Meiner v. Missouri*, 673 F.2d 969, 975–76 (8th Cir.), *cert. denied* 459 U.S. 909, 103 S.Ct. 215 & 230, 74 L.Ed.2d 171 (1982). However, Section 1983 may not be used where the rights asserted are not substantive obligations under federal statute or where the statute governing those rights provides an exclusive remedy for their violation. *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 1544–45, 67 L.Ed.2d 694 (1981); *Crawford v. Janklow*, 710 F.2d 1321, 1326 (1983).

The Court is of the opinion that Section 611 of the Cable Act, 47 U.S.C. § 531, creates substantive rights cognizable under Section 1983. Whether a particular statute creates substantive rights for the purposes of Section 1983 is a question similar to whether there is an implied right of action directly under the statute. *Crawford*, 710 F.2d at 1326. To determine if an implied right of action exists under Section 611, the Court directs its inquiry to the four factors listed in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

First, by the terms of the section, Congress targeted section 611—at least with respect to public access channels—for the especial benefit of those viewing or producing public access broadcasting. Second, the legislative enforcement scheme provides no guidance regarding the intent to grant or deny producers or viewers a remedy to enforce violations of the section. The express remedy created in favor of the franchising authority is not spoken of in terms of exclusivity and is permissive in nature. Third, such a remedy is wholly inadequate—as the allegations herein reveal—as to viewers and producers of public access broadcasting. Finally, whether a franchisee is in violation of Section 611 is purely a matter of federal law. For these reasons, the Court believes the plaintiffs have an implied right of action under Section 611 of the Cable Act, consistent with the teachings of *Cort v. Ash* and, consequently, may maintain an action under Section 1983 to enforce violations of Section 611.