Robert V. BRITTON, Plaintiff,

v.

CITY OF ERIE, PENNSYLVANIA; Erie
City Council; and Erie Cable Television
Access Authority, Defendants.

Civil Action No. 93–248.

United States District Court,
W.D. Pennsylvania.

Sept. 29, 1995.

Robert V. Britton, Erie, PA, pro se.

Gerald J. Villella, City of Erie Solicitor's Office, Erie, PA, for defendants.

### MEMORANDUM

McLAUGHLIN, District Judge.

Plaintiff, Robert Britton, is an African–American. He alleges that Defendants, the City of Erie ("the City"), the Erie City Council, and the Erie Cable Television Access Authority ("Access Authority"),[1] acted with intent to discriminate when they eliminated the city cable television system's public access channel. He brings this action under 42 U.S.C. § 1983 and an implied private right of action under section 611(e) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 531(e). This Court has jurisdiction under 28 U.S.C. §§ 1343 and 1331. Defendants have moved for summary judgment. For the reasons that follow, this Court will dismiss

**1.** Joseph Lisek was also originally named as a defendant in this action. Claims against him have been dismissed. *See infra* at p. 1265–1266.

**2.** Later developments related to this contract are well detailed in *Erie Telecommunications, Inc. v.*

the Complaint in part, grant Defendants' motion in part, and deny that motion in part.

### I. BACKGROUND

Plaintiff produces a show titled "African–American Affairs." At various times, his program has been cablecast on channel 2, the public access station in Erie. He wishes to continue to have this show appear on channel 2.

Because the parties have submitted very little evidence in support of or opposition to this motion, the bulk of this narrative comes from the pleadings and the portions of the parties' briefs that are in agreement.

In 1980, the City and Erie Telecommunications, Inc. ("ETI") entered into a contract under which ETI would construct and operate a cable television system in the City.[2] This agreement was renewed in October 1991. Among the changes made at the time of renewal was that a local access authority would assume control from ETI of public access television in Erie. Franchise Agreement, 10/11/91, at §§ 24–25. The Access Authority was established the following year pursuant to the Pennsylvania Municipal Authorities Act, 53 Pa.Stat. §§ 301 et seq.

ETI continued to provide facilities for editing and playback of public access programs for some time after the 1991 agreement became effective. Plaintiff's show was carried on the public access station during this time. In April 1992, ETI stopped providing these facilities, and public access cablecasting ceased.

Over the next year, the Access Authority began to construct a new studio to be used for public access programming. During the summer of 1993, prior to the completion of this facility, the Access Authority rented a storage facility for its playback and editing equipment. In July 1993, Thomas Lee, an African–American and a member of the Access Authority board, volunteered to play and cablecast prepared tapes on the Access Authority's equipment. ETI carried these

*City of Erie,* 853 F.2d 1084 (3d Cir.1988) and *Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580 (W.D.Pa.1987).

cablecasts on Channel 2 either on several Sunday afternoons in July or from August 1 to 3.

On August 4, 1993, the Access Authority board voted to suspend all use of channel 2. Although Defendants allege that the board voted to resume these cablecasts on August 18, 1993, both parties agree that, on that same date, City Council voted to transfer all assets, equipment, and liabilities of the Access Authority to the City itself.

The parties dispute why these cablecasts were suspended. Defendants argue that Lee had cablecast copyrighted material without first obtaining the permission of the copyright holder. As a result, they submit, the Access Authority board decided to suspend operation of the channel until an executive director could be hired to manage the Access Authority properly.

In support of this version of events, Defendants offer the minutes of the August 4 and 18, 1993 board meetings. The August 4 minutes read in relevant part:

> Tom Paterniti charged that copyright material was being shown on Channel 2 without permission and produced a letter from a production company which he said proved his allegation. Tom Lee strongly denied the charge.

> \* \* \* \* \* \*

> Tom Laskowski motioned to suspend playback on Channel 2 until an Executive Director is in place. Tom Paterniti seconded. The motion passed 3-2. (Yes: Laskowski, Leftwich, Paterniti. No: De-Luca, Lee.)

The August 18 minutes read in relevant part:

> Tom Lee assured the board that if playback is resumed he will keep all permission slips for copyright material on file for public inspection. Tom Lee motioned to restore playback on Channel 2. Tom Laskowski seconded. The motion passed 4-2 (Yes: DeLuca, Laskowski. Lee, Pryce. No: Leftwich, DeLuca.)

> \* \* \* \* \* \*

> Al Richardson thanked the board for reinstating playback. He asked to use the mobile unit for a shoot of "The Great Wetlands Debate" sponsored by the Sierra Club at Gannon on September 22, 1993. Tom Lee motioned to approve the request subject to ironing out the details. Priscilla Pryce seconded. The motion passed 6-0.

Plaintiff, on the other hand, contends that this decision was made in order to silence the viewpoints of African-Americans. He argues that the evidence he has produced indicates the existence of, at least, jury questions as to whether the decision violated his rights under the First and Fourteenth Amendments to the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment, and 47 U.S.C. § 531(e).

Plaintiff supports his position with portions of interrogatories completed by Lee and Thomas Laskowski, another member of the Access Authority board. In response to the inquiry, "Was editorial control ever discussed? In other words, did you or any other Authority members request a review of programs prior to air time? If so, give the dates; state which members were involved and the nature of those conversations," Lee stated:

> Yes. [E]ditorial control was discussed. It was stated the ... way to weed out some types of programs was to use a tape format (8mm Hi) that many people did not have access to. It was stated that they did not want a lot of those church programs on the air or old ladies reading to cats. It was later stated by Tom P. and Tom L. that there were to[o] many African-American programs on an[d] Tom P. said that now I have "that Damn Rob Britton malarki on the air."

In response to the inquiry whether he had engaged in any conversations with members of the City Council about public access within the three months previous to completing the interrogatory, Lee responded:

> Tom P. & Tom Laskowski ... the City Council Board, Dennis Robins, Mayor J. Savocchio and Gary Horton, I felt that there was a gross injustice to the citizens of Erie re stopping playback and shutting down the station, and violation of my rights as a citizen and a member of cable access.

Plaintiff has included Laskowski's answer to the interrogatory, "Why is programming presently not on the air?":

> The Board voted to resume playback. As stated in # 34, however, our assets were seized by the City of Erie later that evening. Had this not occurred, playback would have resumed the following Sunday and would have continued to the present time, presumably with more days and times of programming than just one day a week. I don't know why the City of Erie has not put programming back on the air. To my knowledge, Gary Horton would be the person who could answer that question. To my knowledge, he has been in control of public access since our assets were seized by the City of Erie.

Plaintiff instituted this action on August 18, 1993. On April 19, 1994, the Honorable Glenn E. Mencer, formerly of this Court, adopted the Report and Recommendation of Magistrate Judge Michelle Hawk Kelly and granted Defendants' motion to dismiss this action as to Defendant Joseph Lisek but denied the motion as to the remaining Defendants. Plaintiff moved for a preliminary injunction on October 31, 1994. That motion was denied after a hearing and the decision was not appealed. This motion followed.

## II. STANDARD OF REVIEW

■ The movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." F.R.Civ.P. 56(c). This rule allows parties to demonstrate prior to trial that opposing claims "have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). The inquiry here is "whether there is any need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. F.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## III. DISCUSSION

■ 42 U.S.C. § 1983 provides a cause of action for certain deprivations of civil rights. To recover under § 1983, a plaintiff must "prove he suffered a violation of rights created by federal law, *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1989), at the hands of a person acting under color of state or territorial law, *Gomez v. Toledo,* 446 U.S. 635, 640 [100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572] (1980)." *Karnes v. Skrutski,* 62 F.3d 485, 489–90 (3d Cir.1995).

Defendant City Council argues that it has absolute legislative immunity from this action. All Defendants argue that they are entitled to summary judgment as to each of Plaintiff's three alleged sources of rights.

■ Each of the Defendants is a municipal corporation or affiliated arm of local government. Therefore, any determination that Plaintiff is entitled to proceed to trial on all or a portion of his claims must accord with *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To prevail, Plaintiff must show as to each Defendant that the allegedly violative behavior "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or, although not formally adopted, amounts to a custom of the Defendant. *Id.* at 690–91, 98 S.Ct. at 2035–36. Plaintiff cannot prevail on a theory of respondeat superior—that is, simply by demonstrating the tortious behav-

ior of an employee or other agent. *Id.* at 691, 98 S.Ct. at 2036.

### A. *Plaintiff's § 1983 Claims under the Equal Protection Clause*

 Plaintiff, as an African–American, asserts that the decision to end playback on Channel 2 was motivated by race and deprived him of his rights under the Equal Protection Clause. To succeed on this claim, Plaintiff must demonstrate "[p]roof of racially discriminatory intent or purpose." *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Mody v. City of Hoboken,* 959 F.2d 461, 466 (3d Cir.1992). The Supreme Court has described the required purpose:

> "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted). A mere showing that the decision had a disproportionate effect on African–Americans is not sufficient. *See Arlington Heights,* 429 U.S. at 264–65, 97 S.Ct. at 562–63.

 Defendants first argue that they are entitled to summary judgment because the August 4 decision to end playback terminated all playback over channel 2 without regard to the race of the persons supplying the tapes. However, it has been clear since at least *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), that facially neutral legislation may still violate the Equal Protection Clause if enacted for invidious discriminatory purposes. Therefore, this Court must proceed further.

Defendants next argue that Plaintiff has not produced any evidence of discriminatory purpose or intent. Plaintiff points to Lee's statement that two other members of the Access Authority board complained about the number of "African–American programs" that were being cablecast.

With regard to the Access Authority, this evidence is sufficient to allow Plaintiff to proceed to trial. There is a material issue of fact as to whether the August 4 decision was made for a racially invidious purpose. Because the board made policy for the Access Authority, this Court would have little problem sustaining a finding of discriminatory purpose as consistent with the policy-or-custom requirement of *Monell.*

 Defendants characterize this evidence as probative of legislative motivation, i.e., the reasons for which a particular legislator has voted for a piece of legislation, rather than of legislative purpose or intent. They are correct that this type of evidence is generally disfavored and that a finding of discriminatory motivation alone cannot amount to a constitutional violation. *See Palmer v. Thompson,* 403 U.S. 217, 224–26, 91 S.Ct. 1940, 1944–46, 29 L.Ed.2d 438 (1971); *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968).

 However, the Supreme Court has also recognized that "[t]he legislative or administrative history [of a particular enactment] may be highly relevant" in identifying discriminatory intent or motive in the context of an alleged violation of the Equal Protection Clause. *Arlington Heights,* 429 U.S. at 268, 97 S.Ct. at 565. Plaintiff is not asking this Court to determine the intent of an Act of Congress "on the basis of what fewer than a handful of Congressmen said about it," as was the case in *O'Brien. See* 391 U.S. at 384, 88 S.Ct. at 1683. Rather, the contested August 4 action was approved by a 3 to 2 vote of the Access Authority board, and Plaintiff has offered evidence that suggests two of the three members of the majority were motivated by racially oriented concerns. Under these circumstances, this history is relevant to the issue of intent.

Defendants suggest that *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563 (7th Cir.1989), an employment discrimination case brought under 42 U.S.C. § 1981, supports its position. There, the district court had held that the plaintiffs had not adduced direct evidence of discrimination; applied the

framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); found that the plaintiffs had not produced evidence that could meet their burden of persuasion; and granted summary judgment for the defendant. *Randle,* 876 F.2d at 567. While the plaintiffs' appeal was pending, the Supreme Court issued its decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which clarified that, in cases in which a plaintiff offers direct evidence that an employment decision was motivated at least in part by discriminatory intent, the burden of persuasion shifts to the defendant to prove that it would have made the same decision without regard to the impermissible factor. *Id.* at 244–45, 109 S.Ct. at 1787–88. The plaintiffs argued that they were entitled to this shift in the burden and pointed to "numerous instances where La-Salle managers made racially or ethnically derogatory remarks to or in front of their own employees." *Randle,* 876 F.2d at 570. However, the Seventh Circuit held that the case remained within the *Burdine/McDonnell Douglas* framework and noted that although the managers' comments might be circumstantial proof of the managers' discriminatory animus, these comments were "completely unrelated to the employment decision challenged by the appellants." *Id.*

*Randle* does not support Defendants' position. As Plaintiff notes, this case does not involve allegations of discrimination in employment. However, if it did so, Plaintiff's proffered evidence, if believed, might well be sufficient to bring the action within *Price Waterhouse.* As a result, the burden of persuasion would shift to the Access Authority to prove that it would have suspended playback on channel 2 even in the absence of any racial animus. Thus, *Randle* does not provide a basis on which summary judgment for the Access Authority would be appropriate.

Of course, if the Access Authority is eventually found to be liable to Plaintiff on this theory, that liability cannot extend outside of the period from August 4 to August 18, 1993. On August 18, the Access Authority board voted to resume playback on channel 2, terminating the allegedly discriminatory policy. It is true that playback did not then resume. However, because the Access Authority no longer existed after that date, the failure to resume playback can hardly be characterized as a policy or custom of the Access Authority.

■ Defendants are correct that Plaintiff has not produced evidence sufficient to allow him to proceed to trial on his Equal Protection claims against the City or City Council. The statements in Lee's deposition are not probative of any policy or custom of either the City or City Council. Neither Lee's statements as to *his* comments to the mayor of Erie or members of City Council nor Laskowski's statement that he did not know why City Council had abolished the Access Authority support any inference of racial discrimination, let alone a policy or custom of discrimination that would support liability under *Monell.*

## B. *Plaintiff's § 1983 Claims Under the First and Fourteenth Amendments*

■ Defendants also argue that they are entitled to summary judgment on Plaintiff's claims that they deprived him of his rights under the First and Fourteenth Amendments. Again, Defendants argue that Plaintiff is unable to point to any evidence of discriminatory intent or motive on the part of the Access Authority board or any other Defendant.

■ A public-access cable television channel is a public forum. *Missouri Knights of the Ku Klux Klan v. City of Kansas City, Missouri,* 723 F.Supp. 1347, 1351 (W.D.Mo. 1989). The August 4 decision of the Access Authority board clearly reduced Plaintiff's access, as well as the access of others, to that forum. The first inquiry, therefore, is to determine whether this decision was content-neutral or content-based. *Rappa v. New Castle County,* 18 F.3d 1043, 1053 (3d Cir. 1994). If the decision was content-based, then the Access Authority must "show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99

L.Ed.2d 333 (1988) (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983)). If it was content-neutral, then it must be reviewed in light of the rules of *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) and *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984). *Rappa*, 18 F.3d at 1053–54.

■■■■ Defendants are correct that the decision of the Access Authority board was facially content-neutral, in that it ended all playback on channel 2. Therefore, the inquiry becomes whether the decision was an acceptable restriction on time, place, or manner:

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward*, 491 U.S. at 791, 109 S.Ct. at 2753–54 (quoting *Clark*, 468 U.S. at 293, 104 S.Ct. at 3068–69). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753–54.

As with Plaintiff's Equal Protection claim, the evidence that Plaintiff has produced creates a material issue of fact. According to Lee, at least one of the board members referred to Plaintiff's program as undesirable in the debate prior to the August 4 vote to suspend playback. A reasonable jury presented with this evidence in a manner acceptable at trial could conclude that a desire to prevent Plaintiff's expression of his point of view formed some part of the August 4 decision. This conclusion would prevent the jury's concluding that the decision was an acceptable restriction of time, place, or manner. Thus, summary judgment would be inappropriate.

As with the Equal Protection claim, any potential recovery against the Access Authority on this claim will be limited to damages for the period from August 4 to August 18, 1993.

■■■ The City and City Council are entitled to summary judgment on this motion for the same reasons identified *supra* with regard to Plaintiff's § 1983 claim under the Equal Protection Clause.

C. *Plaintiff's § 1983 Claims Under 47 U.S.C. § 531(e)*

■■ Plaintiff also alleges that Defendants have deprived him of rights created by section 611(e) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 531(e). That section provides that, except for controls on obscene and indecent programming, "a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section."

This section, by its language, protects against the exercise of editorial control by a cable operator. On their earlier motion to dismiss, Defendants argued that, even if § 531(e) created a private right of action, they could not be liable under it because none of them was a "cable operator." In denying the motion to dismiss, this Court did not address that argument. On reflection, this Court is persuaded that Defendants are correct and Plaintiff cannot state a claim that might be recognized under § 531(e) or a claim under § 1983 for the violation of rights recognized in § 531(e).

"Cable operator" is defined in section 602 of the Cable Communications Policy Act, 47 U.S.C. § 522(4):

> [T]he term "cable operator" means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement,

the management and operation of such a cable system.

A "cable system" is defined in relevant part as "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." *Id.* at § 522(6). "Cable service" is the transmission to subscribers of programming and the subscriber interaction necessary to select that programming. *Id.* at § 522(5).

Under these definitions, none of the Defendants can be considered a cable operator. Cable service is provided by ETI. Neither the City nor City Council are alleged to provide transmission of video programming to the City's cable subscribers. Although some of the programming carried on the cable system originated from the Access Authority, this programming was transmitted to subscribers by ETI. None of the parties control or bear responsibility for the operation of the cable system.

*Missouri Knights of the Ku Klux Klan* is not contrary to this conclusion. There, the franchise agreement between Kansas City and the cable operator, ACV, provided that ACV could not delete any of the four dedicated public-use channels without the written permission of the city council of Kansas City. The plaintiffs sought to have their programming cablecast on one of the public-use channels. 723 F.Supp. at 1349. Subsequently, the plaintiffs alleged, ACV and Kansas City officials worked together to eliminate that channel and replace it with a new channel over which ACV would exercise editorial control in a manner that would prevent the cablecast of programs expressing views such as those held by the plaintiffs. *Id.* at 1350.

The district court denied the city's motion to dismiss and held that the plaintiffs could maintain their action against the city under § 1983. The state action requirement, the court held, was met by "[t]he allegation that the City Council and ACV engaged in joint action designed to suppress free speech." *Id.* at 1353–54 (citing *Adickes v. S.H. Kress & Co,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The court further held that § 531(e) created substantive rights that could be vindicated under § 1983. *Missouri Knights,* 723 F.Supp. at 1354.

The allegations of joint action and the complicity of the cable operator are fatally lacking here. Plaintiff has not named ETI as a party or alleged in any way that ETI bears liability or fault for the cessation of the public access cablecasts. ETI has not assumed the aspects of a state actor under *Adickes.* In the same manner, none of the Defendants have assumed the aspects of a cable operator under § 531(e). There is no potential for liability under that section or on a theory of § 1983 liability arising from violation of that section. Therefore, dismissal of these claims as to all Defendants is appropriate.

## IV. *CONCLUSION*

Plaintiff's claims arising from alleged violations of 47 U.S.C. § 531(e), under both § 1983 and the asserted implied private right of action, will be dismissed. Plaintiff may proceed to trial with his claims against the Access Authority alleging violations of his rights under the Equal Protection Clause and the First and Fourteenth Amendments. Summary judgment will be entered in favor of the City [3] and City Council.[4]

In essence, this action may proceed to trial on a claim for money damages arising out of the allegation that the Access Authority deprived Plaintiff of certain constitutional rights between August 4 and August 18, 1993.

---

**3.** None of the parties have provided this Court with a copy of the August 18, 1993 City Council resolution by which the City assumed the liabilities of the Access Authority. Therefore, this Court expresses no opinion as to whether the City could potentially be liable as the successor in interest to the Access Authority.

**4.** Because the Access Authority no longer exists and Plaintiff has not produced sufficient evidence with respect to the City and City Council to maintain this action against those parties, Plaintiff will not be able to obtain his requested injunctive relief.