**Jerry McCLELLAN, et al., Plaintiff,**

v.

**CABLEVISION OF CONNECTICUT, INC., et al., Defendants.**

**Civil No. 3:96CV2077 (PCD).**

United States District Court, D. Connecticut.

Jan. 6, 1997.

Raymond M. Hassett, Louis N. George, Jeffrey M. Siegel, Hassett, George & Siegel, Hartford, CT, John S. Rubrich, Hartford, CT, for Plaintiffs.

James F. Stapleton, Jonathan B. Tropp, Day, Berry & Howard, Stamford, CT, for Defendants, Cablevision of Connecticut, Inc.; Cablevision of Connecticut, Limited Partnership; and Cablevision of Southern Connecticut L.P.

Mark F. Kohler, Attorney General's Office, Public Utility Control, New Britain, CT, for Richard Blumenthal, Attorney General.

Robert T. Perry, Brooklyn, NY, for Media Access New York.

## RULING ON PENDING MOTIONS

DORSEY, Chief Judge.

Plaintiffs allege violations of the Cable Communications Act, 47 U.S.C. § 521 *et seq.* ("CCA") (Count I) and Connecticut's Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110a *et seq.* ("CUTPA") (Count II) and seek a preliminary injunction preventing defendants from denying plaintiff Jerry McClellan ("McClellan") access to defendants' television studios and from airing his programming. Defendants move to dismiss, asserting that plaintiffs do not have a private cause of action under 47 U.S.C. § 531(e) and that supplemental jurisdiction over the CUTPA claim should be declined. For the reasons that follow, defendants' motion to dismiss is granted.

## I. BACKGROUND FACTS

Facts relevant to this motion are alleged as follows. In February 1990, McClellan began producing programming with an "adult comedy" format for public access television. His shows were broadcast on defendants' stations' public access channels. After his show aired on August 19, 1996, on or about August 21, 1996, McClellan was informed that his program would no longer be aired by defendants and he would be denied access to defendants' public access studio.

## II. DISCUSSION

### A. Count I

Defendants move to dismiss the CCA count pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion should be granted only when "it appears beyond doubt" that a plaintiff fails to state any claim upon which relief may be granted. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). All facts alleged are presumed to be true and are considered most favorably to the non-movant. *Williams v. Avco Lycoming,* 755 F.Supp. 47, 49 (D.Conn.1991).

Plaintiffs allege that defendants' denial of access to the studio and the refusal to air his program on their public access channels is editorial control violative of 47 U.S.C. § 531(e). Public access channels are designated for public, educational or governmental use. Section 531(e) provides that "a cable operator shall not exercise any editorial control over ... use of [public access] channel capacity ... except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity."

■ Defendants contend that plaintiffs do not have a private cause of action to enforce § 531(e). Neither § 531(e) nor any other statute explicitly authorizes a private cause of action for a violation of § 531(e). The question of whether an implied cause of action exists under § 531(e) is guided by the following factors: (1) whether plaintiff is one for whose special benefit the statute was enacted; (2) whether there is explicit or implicit legislative intent to create or deny such a remedy; (3) whether an implied cause of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is left by tradition to state law, in an area basically the concern of the states and therefore it is inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975).

■ Plaintiffs rely on *Glendora v. Cablevision Systems Corp.,* 893 F.Supp. 264 (S.D.N.Y.1995) for their assertion that these four factors are present and that a private cause of action should be implied.[1] The *Glendora* court found all four factors present. Defendants assert that a subsequent decision by the Supreme Court, *Denver Area Educational Telecommunications Consortium v. Federal Communications Commission,* — U.S. ——, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996), has called into question the reasoning relied on in *Glendora.*

As to the *Cort* second factor,[2] the *Glendora* court noted that the enforcement provision applicable to public access stations, § 531(c), did not explicitly include § 531(e).[3] *Glendora,* 893 F.Supp. at 268. Title 47 U.S.C. § 531(c) provides:

A franchising authority *may* enforce any requirement in any franchise regarding the providing or use of such channel capacity. Such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator

---

1. Plaintiffs also cite *Missouri Knights of the Ku Klux Klan v. Kansas City, Mo.,* 723 F.Supp. 1347 (W.D.Mo.1989), and *Altmann v. Television Signal Corp.,* 849 F.Supp. 1335, 1341 n. 6 (N.D.Cal. 1994) for her contention that there is an implied private cause of action to enforce § 531(e). However, the findings in these cases are not compelling. In *Missouri Ku Klux Klan,* three of the four counts were based on the First and Fourteenth Amendments. The fourth count, based on 42 U.S.C. § 1983 and § 531, specifically alleged, and the court found, that for purposes of establishing substantive rights under 42 U.S.C. § 1983, local redress was inadequate. *Missouri Ku Klux Klan,* 723 F.Supp. at 1354. *Altmann* cited *Missouri Ku Klux Klan* in a footnote noting that an implied cause of action exists under § 531(e). However, the cause of action in *Alt-*

mann was based on the First Amendment, not § 531(e). *Altmann,* 849 F.Supp. at 1341 n. 6.

2. Based on the remand, *Glendora v. Cablevision Systems Corp.,* 45 F.3d 36 (2d Cir.1995), the District Court found an implication that the Court of Appeals intended to suggest the existence of an implied right of an individual to bring an enforcement action. *Glendora,* 893 F.Supp. at 268. However, the Court of Appeals was not squarely faced with that issue and specifically questioned the existence of a private right to enforce § 531(e). *Glendora,* 45 F.3d at 38.

3. There is no explicit statutory provision of a private remedy to enforce § 531(e), leaving the question whether such a remedy may be implied.

which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority pursuant to subsection (b) of this section.

47 U.S.C. § 531(c) (emphasis added). The court noted that § 531(c) was permissive and only applied to the § 531(e) requirement if a specific franchise agreement incorporated federal law. *Glendora*, 893 F.Supp. at 268.[4]

The court also noted that the CCA explicitly conferred a private cause of action to aggrieved persons for a violation of a similar editorial control provision regarding leased access cable programming, which is programming on channels made available for commercial lease by unaffiliated third parties. *Id.*; see 47 U.S.C. §§ 532(c)(2) and (d). It found that the similarity between the leased access and the public access editorial control provisions supported the conclusion that Congress intended a private cause of action for the public access users. *Glendora*, 893 F.Supp. at 269. The court stated an overarching concern regarding the second factor: "[I]t is difficult to believe that Congress provided a panoply of enforcement mechanisms for leased access producers without intending to provide any direct method of enforcing public, educational, or governmental access to cable channels." *Id.* at 268.[5]

The *Glendora* court concluded that, as to factor three, the CCA's stated goal to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public" was furthered by a private cause of action for the public access user. *Id.* at 269; See 47 U.S.C. § 521(4).

Factor four was satisfied, according to the court, as the claim would not be traditionally relegated to state law because one of the purposes of the CCA is to "establish a national policy concerning cable communica-

tions." *Glendora*, 893 F.Supp. at 269; See 47 U.S.C. § 521(1).

The absence of an explicit provision of a private remedy to enforce § 531(e) is a sharp contrast to the panoply of enforcement mechanisms available to leased access users.

*Denver* calls into question the *Glendora* court's conclusion regarding the second, third and fourth *Cort* factors. The *Denver* decision explains why Congress may have provided a "panoply" of enforcement mechanisms for leased access channels, and not provided the same for public access channels. In *Denver*, the Court examined the constitutionality of several provisions of the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Consumer Protection Act") which amended §§ 531 and 532 of Title 47. The two provisions relevant to the instant analysis permitted a cable operator to prohibit broadcasting of programming the "operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner." Cable Consumer Protection Act, § 10(a) (applies to leased access channels) and § 10(c) (applies to public access channels).

In determining the provisions' constitutionality, the Court examined the historical and institutional differences between leased access and public access channels. It noted that while leased channels maintained total control of programming during their time slot, public access channels are normally subject to various complex supervisory systems. *Denver*, at ——, 116 S.Ct. at 2394.

> Municipalities generally provide in their cable franchising agreements for an access channel manager, who is most commonly a nonprofit organization, but may also be the municipality, or, in some instances, the cable system owner.... Access channel activity and management are partly financed with public funds—through franchise fees

---

4. The prohibition of § 531(e) is incorporated into the franchise by operation of Connecticut law. See *Housatonic Cable Vision v. Dep't of Pub. Util. Control*, 622 F.Supp. 798, 809–12 (D.Conn.1985); Conn.Gen.Stat. § 16–331a(g).

5. What the *Glendora* court meant by the lack of a "direct method" of enforcement is unclear. Connecticut mandates public access program-

ming, Conn.Gen.Stat. § 16–333c, and under Department of Public Utility Control ("DPUC") regulations, requires minimum standards for such programming and availability of the channel. Regs. of Conn. State Agencies, §§ 16–333–33a to –36. The regulations prohibit editorial control. Regs. of Conn. State Agencies, § 16–333–33a(b).

or other payments pursuant to the franchise agreement, or from general municipal funds ...—and are commonly subject to supervision by a local supervisory board. *Id.* at ——— ———, 116 S.Ct. at 2394–95. Through these systems, programming policy can be made and the system policed by various methods including certification of compliance with local standards and adult content advisories. *Id.* at ———, 116 S.Ct. at 2395. Regardless of the methods used to control public access programming, the result is the same: a locally accountable body to control the content of public access programming. *Id.* at ———, 116 S.Ct. at 2395.

The Court found that the provision permitting the cable operator to maintain editorial control of the public access programming "could radically change present programming-related relationships among local community and nonprofit supervising boards and access managers, which relationships are established through municipal law, regulation and contract ... [and] would greatly increase the risk that certain categories of programming ... will not appear." *Id.* at ———, 116 S.Ct. at 2397. The origin of public access channels was cited to be state law.[6] See Conn.Gen.Stat. § 16–331a, 333(c); Regs. Conn.State Agencies §§ 16–333–31 to –36.

This analysis explains why Congress would have purposely included a private cause of action for alleged violations of the provisions relating to leased access programming, 47 U.S.C. § 532, but not for public access programming. The controls exercised by the locally accountable bodies had the ability to provide enforcement mechanisms at a local level, which historically is the level at which such controls have been exercised. *Denver* at ———, 116 S.Ct. at 2394. Such controls were preserved for franchising authorities in § 531(b). Thus "[w]hether these locally accountable bodies prescreen programming, promulgate rules for the use of public access channels, or are merely available when problems arise, the upshot is the same: there is a locally accountable body capable of addressing the problem, should it arise, of patently offensive programming...." *Denver*, at ———, 116 S.Ct. at 2395.[7]

Assuming, then, that the first *Cort* factor favors a private cause of action, the *Glendora* court's analysis of the three other factors is undermined by *Denver*. As to the second factor, Congress provided an explicit remedy for leased access channels, and not for public access channels. Though the absence of any explicitly stated private remedy is not dispositive, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548 (1983), the absence could lend credence to an intended omission. To imply a private right of action assumes that the omission was not intentional and that Congress left it to the courts to decide if such a right should be implied or not. The express provision of private remedies in several sections of the CCA militates against finding Congress intended to leave to the courts to imply its intent that there be such a remedy for § 531(e). *See Hahn v. Rifkin/Narragansett So. Fla CATV Limited Partnership*, 941 F.Supp. 1196 (S.D.Fla. 1996). "[W]hen Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).

Coupling this analysis with the historical structure of the public access channel, it is evident that Congress purposefully excluded a private cause of action to remedy any alleged violations of § 531(e) and left such enforcement up to locally accountable bodies. Plaintiffs offer no sound argument to explain Congress' explicit provision of a private right of action with respect to leased access channels but none for the public access channels.

Likewise, for the third *Cort* factor, in light of the *Denver* analysis, implication of a private remedy is not consistent with the legislative scheme. Implying a private cause of

---

6. Justice Breyer discusses the origin and history as part of the differences of public access channels from leased channels. Public channels originated by reservation of such channels by the municipalities which initially granted the franchises to cable operators.

7. Though they so argue, plaintiffs have not shown that the DPUC is inadequately charged or staffed to enforce the appropriate level of public channel programming.

action for public access channels would remove local control of the channels, which Congress incorporated into the national policy regarding cable programming.

The stated purposes of Congress in enacting the Cable Act include:

(1) [to] establish a national policy concerning cable communications;

(2) [to] establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;

(3) [to] establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;

47 U.S.C. § 521.

The analysis in *Denver* indicates that the exercise of editorial control was to be left to local authorities. This is not, as plaintiffs assert, contrary to establishment of a national policy regarding cable communications. The stated purposes make evident that although Congress was establishing a national policy, its policy included control by local authorities over some issues.

To imply a private action to enforce § 531(e) would, contrary to the policy expressed in § 521(3), vitiate the authority of locally accountable bodies to which one such as plaintiffs could turn. See §§ 531(c), 544(d). Connecticut's Department of Public Utility Control is available. Regs. of Conn. State Agencies, § 16–333–33a to –36. Plaintiffs' reliance on the establishment of a national policy, preclusive of local control, fails to accommodate the inclusion of locally accountable bodies in that policy. Furthermore, it is significant that cable operators in Connecticut may not exert control over public access programming. Regs. of Conn. State Agencies, § 16–333–33a(b).

The *Denver* analysis makes clear that the fourth *Cort* factor weighs in favor of not finding a private cause of action, as editorial control of public access programming has historically been vested in locally accountable bodies.

Denver's distinction between § 531 and § 532 supports a finding that what Congress intended in the way of enforcement of § 532, and so provided, it did not intend for § 531 and intentionally did not so provide. Therefore plaintiffs do not have a private cause of action under § 531(e) and thus fail to state a claim upon which relief can be granted. Accordingly Count I is dismissed.

### B. *Count II*

The second count is a CUTPA state claim. Since the federal Cable Act claim is dismissed, supplemental jurisdiction over the state claim is denied. 28 U.S.C. § 1367(c)(3). Thus, Count II is dismissed without prejudice.

### III. CONCLUSION

Accordingly, defendants' motion to dismiss (doc. 20) is **granted**. Plaintiff's motion for preliminary injunction (doc. 8) is **denied without prejudice.**

SO ORDERED.