Jerry McCLELLAN, Jonathan Cooper, and Notu Bayonne, Plaintiffs–Appellants,

v.

CABLEVISION OF CONNECTICUT, INC., Cablevision of Connecticut, Limited Partnership, and Cablevision Systems of Southern Connecticut, L.P., Defendants–Appellees,

No. 97–7156.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1998.

Decided July 17, 1998.

Louis N. George, Hassett, George & Siegel, P.C., Hartford, Connecticut for Plaintiffs–Appellants.

James F. Stapleton, Day, Berry & Howard, Stamford, Connecticut (Allan B. Taylor and Jonathan B. Tropp, Day, Berry & Howard, Stamford, Connecticut, of counsel), for Defendants–Appellees.

Robert T. Perry, Brooklyn, New York (Brian D. Graifman, Caro & Graifman, New

York City, of counsel), for Amicus Curiae Media Access New York.

Before: CALABRESI, CABRANES, and HEANEY,[*] Circuit Judges.

HEANEY, Circuit Judge:

## I.

Jerry McClellan, Jonathan Cooper, and Notu Bayonne (collectively "appellants") appeal from the January 6, 1997 order of the United States District Court for the District of Connecticut (Peter C. Dorsey, *Chief Judge* ) dismissing their complaint which alleged violations of the Cable Communications Policy Act ("CCPA"), 47 U.S.C. §§ 521–573, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110a to 42–110q, by Cablevision of Connecticut, Inc.;[1] Cablevision of Connecticut, L.P.; and Cablevision of Southern Connecticut, L.P. (collectively "Cablevision"). In its order, the district court held that the CCPA does not provide a private cause of action for the violations alleged by appellants and that, in the absence of a federal claim, supplemental jurisdiction over appellants' CUTPA claims would be improper. Because we hold that the CCPA provides an implied private cause of action, we reverse.

## II.

The relevant facts[2] for this appeal are as follows: Jerry McClellan produced television programming for broadcast on Cablevision's public access channels. Bayonne and Cooper claim that they are viewers of McClellan's public access programming. According to Cablevision, McClellan broadcast a show on August 19, 1996, that contained sexually explicit material.

Citing alleged violations of its rules,[3] Cablevision informed McClellan that Cablevision's stations would indefinitely refuse to carry any of McClellan's shows on their public access channels. Cablevision also informed McClellan that he would no longer have access to Cablevision's public access studio. On October 10, 1996, appellants brought an action in federal court claiming violations of the CCPA[4] and CUTPA. In addition to money damages, appellants requested a temporary restraining order and preliminary and permanent injunctive relief to prevent Cablevision from continuing to deny McClellan the use of Cablevision's public access studio and from refusing to broadcast McClellan's programs.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Cablevision moved the district court for dismissal, arguing that the CCPA provides no private remedy for violations of 47 U.S.C. § 531(e) and that the

---

[*] The Honorable Gerald W. Heaney, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Appellees note that 'Cablevision of Connecticut, Inc.' is a nonexistent entity. They do not dispute, however, that Cablevision of Connecticut, L.P. and Cablevision of Southern Connecticut, L.P. are proper parties to the action.

2. As was proper on a motion to dismiss on the pleadings, where plaintiff's allegations are to be taken as true, the district court merely recited the factual allegations of McClellan's complaint. *See McClellan v. Cablevision of Conn., Inc.*, 949 F.Supp. 97, 98 (D.Conn.1997). To the extent that we supplement the factual recitation here with other allegations also drawn from the pleadings, we do so only to flesh out the background of the action; that factual context, however, has no bearing on the questions of law on which this appeal turns.

3. Cablevision claimed that McClellan deliberately violated its rules governing the submission of programming for broadcast on its public access

channels by preventing Cablevision from reviewing a tape of the August 19th show prior to its broadcast, by causing Cablevision to broadcast the show by subterfuge, and by refusing to permit Cablevision to review the tape of his program after it aired.

4. Specifically, McClellan alleges that Cablevision has impermissibly exercised editorial control over a public, educational, or governmental ("public access") cable channel under 47 U.S.C. § 531(e), which provides:

> Subject to section 544(d) of this title, a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity.

*Id.*

district court should not exercise supplemental jurisdiction over the remaining CUTPA claims. Appellants opposed the motion, responding that § 531(e) contains an implied cause of action.

The district court granted Cablevision's motion to dismiss, holding that under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), § 531(e) provides no implied private cause of action. Having dismissed appellants' federal claim, the district court then declined to exercise supplemental jurisdiction over appellants' CUTPA claim. *See McClellan v. Cablevision of Conn., Inc.,* 949 F.Supp. 97, 102 (D.Conn.1997) ("*McClellan I*"). In reaching its decision, the district court acknowledged that another district court in this circuit had determined that an implied cause of action exists under § 531(e). *See McClellan I,* 949 F.Supp. at 99–100 (citing *Glendora v. Cablevision Sys. Corp.,* 893 F.Supp. 264, 268 (S.D.N.Y.1995)). Nonetheless, the district court concluded that *Denver Area Educational Telecommunications Consortium, Inc. v. FCC,* 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996), undermined the *Glendora* holding. *See McClellan I,* 949 F.Supp. at 99–100. Specifically, the district court relied on *Denver*'s emphasis on the "various complex supervisory systems" to which public access channels are subject. *See McClellan I,* 949 F.Supp. at 100 (citing *Denver,* 518 U.S. at 760–61, 116 S.Ct. 2374). Citing the local "supervisory systems" for public access channels, and the channels' historical development through state and local law, the district court determined that several factors identified in *Cort* do not support a private cause of action under § 531(e). *See McClellan I,* 949 F.Supp. at 100–01.

### III.

■ We review de novo the district court's grant of a rule 12(b)(6) motion to dismiss. *See Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (citation omitted). Granting a motion to dismiss for a plaintiff's failure to state a claim is only proper where the court has no doubt that the plaintiff can prove no set of facts to demonstrate that the plaintiff is entitled to relief. *See id.*

■ The sole question before us in this appeal is whether § 531(e) provides an implied private cause of action for cable programmers.[5] We agree with the district court that we determine whether § 531(e) contains an implied private remedy by analyzing the statute under the four-prong analysis provided by *Cort. See Cort,* 422 U.S. at 78, 95 S.Ct. 2080. Under *Cort,* we first determine whether the plaintiff is one for whose "especial" benefit Congress enacted the statute. *Id.* (citation omitted). Second, we examine whether there is any indication of an explicit or implicit legislative intent to create or deny a private remedy. *See id.* (citation omitted). Third, we consider whether implying a private remedy is consistent with the "underlying purposes of the legislative scheme." *Id.* (citations omitted). Fourth, we determine whether the cause of action is one "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* (citations omitted).

■ Recent Supreme Court decisions have refocused the *Cort* analysis to "emphasize the centrality of the second factor—congressional intent," treating the other factors as "proxies for legislative intent." *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 77–78 (2d Cir.1992) (quoting *Health Care Plan, Inc. v. Aetna Life Ins. Co.,* 966 F.2d 738, 740 (2d Cir.1992) and citing *Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)). We conclude that the legislative record demonstrates Congress's intent to provide a private cause of action under

---

**5.** Neither party specifically briefed or argued the separate question of whether viewer-plaintiffs Cooper and Bayonne raised a federal claim on their own behalf that is cognizable under § 531(e). For this reason, we leave it to the district court on remand to consider any such issues in the first instance.

§ 531(e), and that the remaining *Cort* factors support our conclusion.

### A.

Under the first factor, it is clear that McClellan is within the class of intended beneficiaries of § 531(e)'s prohibition of editorial control over public access channels. In enacting § 531(e), Congress was keenly aware that individuals or organizations, other than licensees or owners of various electronic media, do not always have access to those media. *See* H.R.Rep. No. 98–934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667. The legislative history states that:

> Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas.

*Id.* Thus, the core First Amendment rights of individual speakers were of paramount concern to Congress. Moreover, Congress has explained that "[a] requirement of reasonable third-party access to cable systems will mean a wide diversity of information sources for the public—the fundamental goal of the First Amendment." *Id.; see also* 47 U.S.C. § 521(4) (stating that the CCPA promotes "the widest possible diversity of information sources and services to the public"); *cf. Time Warner Cable of N.Y.C. v. Bloomberg L.P.,* 118 F.3d 917, 929 (2d Cir.1997) ("[M]uch of [public access] programming has a limited, often specialized audience whose needs are not otherwise met."). Because Congress prohibited cable operators from exercising editorial control over public access programming and because Congress clearly concerned itself with the interests of producers of programs broadcast on public access channels, we conclude that the appellant falls within the class of intended beneficiaries of § 531(e).

### B.

■ Second, there is an implicit legislative intent to create a private cause of action to enforce the rights established under § 531(e). "[I]n situations in which it is clear that federal law has granted a class of persons certain rights [as Congress has under § 531(e)], it is not necessary to show an intention to *create* a private remedy, although an explicit purpose to *deny* such cause of action would be controlling." *Cort,* 422 U.S. at 82, 95 S.Ct. 2080 (emphasis in original) (footnote omitted).

Although § 531(e) does not expressly create or deny a private cause of action, the district court relied on *Touche Ross,* 442 U.S. at 572, 99 S.Ct. 2479, to conclude that because Congress specifically provided private remedies in other sections of the CCPA, it purposefully withheld a private cause of action under § 531(e). *See McClellan I,* 949 F.Supp. at 101; *see also* 47 U.S.C. § 532(d) (providing a cause of action in federal court for any person aggrieved by a cable operator's refusal to make channel capacity available for leased access). The district court stated, "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *McClellan I,* 949 F.Supp. at 101 (quoting *Touche Ross,* 442 U.S. at 572, 99 S.Ct. 2479).

In our view, *Touche Ross* is distinguishable from the present case. In *Touche Ross,* the Supreme Court considered whether 15 U.S.C. § 78q(a) provided an implied private cause of action for those claiming injury by an accountant's failure to maintain certain records and reports. *See Touche Ross,* 442 U.S. at 568, 99 S.Ct. 2479. In reasoning that § 78q(a) provided no implied private cause of action, the Court noted that in cases where it had found an implied private cause of action, "the statute in question at least prohibited certain conduct or created federal rights in favor of private parties." *Id.* at 569, 99 S.Ct. 2479 (citations omitted). The Court found that § 78q(a) neither prohibited conduct nor created private federal rights. In contrast with the statute at issue in *Touche Ross,* § 531(e) clearly prohibits cable operators from exercising editorial control over public access programming.

We disagree with the district court's assertion that Congress purposefully withheld a private federal remedy in favor of exclusive

enforcement of § 531(e) by local authorities. In this regard, it is significant that Congress specifically reserved regulatory power for local franchising authorities in other sections of the CCPA. For instance, 47 U.S.C. § 544(b) permits a local franchising authority to establish and enforce requirements for facilities and equipment necessary to establish or operate a cable system. Also, 47 U.S.C. § 543(a) provides that local franchising authorities shall regulate the rates for the provision of cable service where cable systems are not subject to competition. It is clear from these provisions that had Congress intended to extend the tradition of local franchising authority regulation of cable operators to include enforcement of § 531(e), Congress knew how to do so and could have done so by making an explicit reservation.[6]

Although the congressional record contains no clear indication as to whether Congress intended to create an implied private cause of action under § 531(e), we believe that the statute's subsequent legislative history points toward a finding that Congress so intended. When Congress modified § 531 in 1992 and 1996, three district courts had held that § 531(e) provided a private cause of action. *See Missouri Knights of the Ku Klux Klan v. Kansas City, Mo.*, 723 F.Supp. 1347, 1354 (W.D.Mo.1989),[7] *Altmann v. Television Signal Corp.*, 849 F.Supp. 1335, 1341 n. 6

(N.D.Cal.1994) (citing *Missouri Knights*, 723 F.Supp. at 1354), and *Glendora*, 893 F.Supp. at 269.[8]

■ Congress, when amending § 531 in 1992 and 1996, neither referred to the courts' interpretation that § 531(e) contains an implied private cause of action nor amended the statute to specify that no such private right exists. When a statute is first enacted, we begin our inquiry into whether it provides a private remedy by asking "whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). However, when "Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, . . . the question is whether Congress intended to preserve the pre-existing remedy." *Id.* at 378–79, 102 S.Ct. 1825. When Congress amended § 531, we presume that it was aware that federal courts had found an implied private remedy in § 531(e), and that Congress chose to leave the remedy in place. *See Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . .").[9]

---

**6.** Cablevision argues that in § 531(c) Congress specified the enforcement mechanism by which it intended to enforce § 531(e)'s prohibition of editorial control over public access channels. Section 531(c) provides that "[a] franchising authority may enforce any requirement in any franchise regarding the providing or use of [public access] channel capacity." 47 U.S.C. § 531(c). We find this section inapposite in that the prohibition of editorial control mandated by § 531(e) is a statutory requirement, not a franchise requirement.

**7.** The district court in the present case distinguished *Missouri Knights* by pointing out that there the question of whether an implied cause of action exists under § 531(e) arose in the context of a 42 U.S.C. § 1983 claim. *See McClellan I*, 949 F.Supp. at 99 n. 1. We believe the distinction is irrelevant for the purpose of establishing the legal context in which Congress reviewed § 531(e) when amending the statute. After applying the *Cort* factors, the court in *Missouri Knights* made its holding abundantly clear that § 531(e) provides an implied private cause of action. *See Missouri Knights*, 723 F.Supp. at

1354 ("[T]he Court believes the plaintiffs have an implied right of action under Section 611 of the Cable Act [codified at 47 U.S.C. § 531].").

**8.** We note that the *Glendora* court subsequently vacated its holding that § 531(e) provides an implied private cause of action. Instead, the *Glendora* court incorporated the reasoning in *McClellan I*, as a substitute for its earlier analysis, to hold that no such implied cause of action exists. *See Glendora v. Cablevision Sys. Corp.*, No. 93 Civ. 8344, slip op. (S.D.N.Y. March 25, 1998). However, our analysis of the legislative history of § 531(e) is unaffected as the court's reversal came well after Congress made its 1996 amendments to the CCA.

**9.** We acknowledge that the legal context in which Congress enacted the statute considered in *Cannon* was more pervasive than that in which Congress amended § 531(e). *See Cannon*, 441 U.S. at 696, 99 S.Ct. 1946. In *Cannon*, a federal court of appeals and over a dozen federal district courts had consistently interpreted the critical language at issue to provide an implied private remedy. In this case, only three federal district

## C.

Third, implying a private remedy under § 531(e) is consistent with Congress's legislative scheme. In holding to the contrary, the district court cited the *Denver* plurality for the proposition that, whereas leased access channels were created by federal statute, public access channels began as creations of state and local governments and were historically regulated by locally accountable authorities. *McClellan I*, 949 F.Supp. at 100–02 (citing *Denver*, 518 U.S. at 760–63, 766, 116 S.Ct. 2374). The district court then concluded that the CCPA maintains the historical distinction between the editorial control of leased channels and that of public access channels. *Id.* at 101. Specifically, the district court found that the presence of an explicit private remedy under 47 U.S.C. § 532(c),[10] and the absence of a remedy under § 531(e), demonstrates that Congress intended to provide for the federal regulation of leased channels and for continued local control of public access channels. *Id.* at 102.

Although *Denver* did not address § 531(e), our analysis is affected by the *Denver* plurality's [11] observation that cable operators have not traditionally exercised editorial control over public access channels.[12] *See Denver*, 518 U.S. at 761, 116 S.Ct. 2374. The plurality noted that locally accountable bodies [13] (in contrast to cable operators) have traditionally provided supervision over public access channels and are "capable of addressing the problem, should it arise, of patently offensive programming." *Id.* at 763, 116 S.Ct. 2374.

The language in *Denver* reinforces the finding that, by enacting § 531(e), Congress specifically intended to withhold from cable operators the authority to exercise editorial control consistent with the history of public access channels. Contrary to the holding in *McClellan I*, the fact that locally accountable bodies have traditionally prevented patently offensive programming does not lead to a conclusion that Congress vested those bodies with exclusive authority to enforce § 531(e),

---

courts had held that § 531(e) provides an implied private cause of action by the time Congress made its 1996 amendments to the CCPA, although no court had made a determination to the contrary. We point out, however, that the events surrounding the *Missouri Knights* case were the subject of widespread attention from the national media, increasing the likelihood that Congress was aware of the prevailing legal context of the statute. *See, e.g., Kansas City Restores Cable Outlet to Which the Klan Sought Access*, N.Y. Times, July 16, 1989, § 1, at 20; David A. Kaplan, *Is the Klan Entitled to Public Access?*, N.Y. Times, July 31, 1988, § 2, at 25; *White Supremacists Find a TV Platform Via Public Access*, Wall St. J., July 12, 1988, at 38; *The Ku Klux Klan and 'Klansas City Kable,'* Newsweek, July 4, 1988, at 21.

10. Section 532(c)(2) provides that:
   A cable operator shall not exercise any editorial control over any video programming provided pursuant to this section, or in any other way consider the content of such programming, except that a cable operator may refuse to transmit any leased access program or portion of a leased access program which contains obscenity, indecency, or nudity....
   47 U.S.C. § 532(c)(2). The CCA provides an explicit private cause of action for violations of the § 532(c)(2) proscription in § 532(d):
   Any person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to this section may bring an action in the district court of the United States for the judicial district in which

the cable system is located to compel that such capacity be made available.
47 U.S.C. § 532(d).

11. Despite the fact that three justices joined in Part IV of Justice Breyer's opinion in *Denver*, which provides the discussion relevant to this case, we believe that the propositions for which we cite *Denver* are supported by a majority of the Supreme Court. *See Denver*, 518 U.S. at 792–94, 116 S.Ct. 2374 (Kennedy, J., with whom Ginsburg, J., joins, concurring in part, concurring in judgment in part, and dissenting in part).

12. Therefore, the *Denver* plurality continued, the cable operators' "countervailing First Amendment interest is nonexistent, or at least much diminished." *Id.* at 761, 116 S.Ct. 2374 (citation omitted). In other words, where a newspaper publisher has a First Amendment right to control the editorial content of the newspaper, a cable operator has no analogous interest in a public access channel's broadcasts, where information should flow freely.

13. Prior to the CCPA, nearly all regulation of cable television occurred through the franchise process conducted at the local government level. *See* H.R.Rep. No. 98–934, at 19, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4656. In describing local control of public access channels, the *Denver* Court referred to the "access channel manager" that local governments might require in their franchise agreement with a cable operator. *Denver*, 518 U.S. at 761, 116 S.Ct. 2374.

which prohibits a cable operator from exercising editorial control over programs that do not contain obscenity, indecency, or nudity.

■ Congress's purpose in enacting the CCPA was to "establish[ ] a national policy that clarifies the current system of local, state, and Federal regulation of cable television." H.R.Rep. No. 98–934, at 19, 1984 U.S.C.C.A.N. at 4656. Consistent with *Denver*, the CCPA permits a locally accountable body, typically the local franchising authority, to control the operation of public access channels. *See* 47 U.S.C. § 531(c) ("A franchising authority may enforce any requirement in any franchise regarding the providing or use of [public access] channel capacity."). However, a local franchising authority may avoid liability in its exercise of editorial control of public access channel content only to the extent that it exercises such control within First Amendment boundaries. *Cf., e.g., Denver*, 518 U.S. at 743–44, 116 S.Ct. 2374 (citations omitted) (referring to the constitutional permissibility of regulating radio broadcasts of patently offensive, sex-related material easily accessed by children, and noting that the same compelling interest may be invoked with respect to cable channel broadcasts).

Neither *Denver* nor the language of the CCPA indicates that Congress intended to permit cable operators to exercise broad editorial control over public access channels.[14] Instead, the CCPA establishes the authority of local governments to regulate cable television through the franchise process. Although the CCPA permits locally accountable authorities to enforce the franchise agreements and control the operation of public

access channels, the CCPA also "contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas." H.R.Rep. No. 98–934, at 19, 1984 U.S.C.C.A.N. at 4656. In addition, if a municipality, through its local franchise authority, improperly restricts a citizen from broadcasting on a public access channel, the citizen may seek redress of such a violation in federal court under 42 U.S.C. § 1983.[15] *See Coplin v. Fairfield Pub. Access Television*, 111 F.3d 1395, 1398 (8th Cir.1997) (permitting a § 1983 claim for violations of the First Amendment and the CCPA against a city council and a local cable regulatory board created by the council by a private party prevented from broadcasting programs on a public access channel). Considering the goals of the CCPA and the history of public access channels, it would be anomalous to provide a private federal remedy to a party prevented from broadcasting on a public access channel by a local franchise authority while refusing to provide a similar remedy to a party denied access by a cable operator.

It is our view that the federal courts are the appropriate final arbiters of whether the content of a public access program is properly excluded from broadcast on a public access channel. Finding an implied private cause of action under 531(e) ensures the right of a private citizen to challenge the exercise of editorial control over public access programming by either a locally accountable authority under 42 U.S.C. § 1983, or, as in this case,

---

**14.** The district court did not address whether McClellan's August 21, 1996 program contained material that Cablevision could properly reject within statutory and constitutional boundaries, *see* § 531(e) and *Denver*, 518 U.S. at 766, 116 S.Ct. 2374, and it would be inappropriate for us to address the issue on appeal. Even if the court were to find the material in McClellan's August 21, 1996 program to be properly excluded, § 531(e) provides no support for Cablevision's refusal to broadcast *all* of McClellan's future programming—the strongest and broadest possible form of editorial control—because such action clearly falls outside of the statute's exception.

**15.** Section 555a(a) limits the remedies available for such claims. That section provides:

> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service ..., any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a(a).

by a cable operator under § 531(e).[16] We conclude that this result is the most consistent with a legislative scheme intended to provide "an environment of many tongues speaking many voices." H.R. Rep. 98–934 at 19, 1984 U.S.C.C.A.N. at 4656 (internal quotation marks omitted).

### D.

Fourth, appellants' cause of action is not one traditionally left to state control in an area that is basically the concern of the states.[17] The district court determined that the fourth factor "weighs in favor of not finding a private cause of action, as editorial control of public access programming has historically been vested in locally accountable bodies." *McClellan I*, 949 F.Supp. at 102. We disagree. We do not believe that the analysis under the fourth factor requires us to consider whether cable television or, more specifically, public access channels have traditionally been subject to local control. Even if we agreed that the historical background of the channels controlled the outcome of the inquiry, we do not believe that the present state of public access is an area basically the concern of the States.

We view the proper analysis to be whether the goal of § 531(e), to permit the free flow of information through an important public forum, is one traditionally left to the states. We do not believe that it is. Free speech is such an intrinsic, fundamental value in our federal system that the right to free expression is codified in the first entry of the Bill of Rights. *See* U.S. Const. amend. I. The

interest sought to be protected by § 531(e) "is akin to, if indeed it is not the same as, the interest protected by the First Amendment." H.R. Rep,. 98–934, at 31, 1984 U.S.C.C.A.N. at 4668 (internal quotation marks and citation omitted). Because the development and regulation of public access channels and the protection of free speech rights are not matters solely of concern to state or local government, we conclude that the fourth *Cort* factor also favors a finding of an implied private cause of action under § 531(e).

### IV.

For the foregoing reasons, we hold that all four *Cort* factors dictate that we find an implied private cause of action under § 531(e). Accordingly, we reverse the district court's decision and remand for proceedings consistent with this opinion.

16. Because Appellants did not bring a claim against Cablevision under § 1983, we do not address whether such a claim would be appropriate.

17. Cablevision concedes that the implication of a private remedy under § 531(e) is somewhat consistent with Congress's desire to establish a national policy concerning cable communications. Cablevision argues, however, that the implication is questionable because the exercise of editorial control over obscenity requires an analysis of local community standards—an analysis that, Cablevision implies, is ideally performed by local entities such as franchising authorities. It is true that "obscene material is not protected by the First Amendment; ... that [it] can be regulated by the States ...; and ... that obscenity is to be

determined by applying 'contemporary community standards.'" *Miller v. California*, 413 U.S. 15, 36–37, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (citations omitted). Although community standards vary from state to state, *see id.* at 32–33, 93 S.Ct. 2607, the courts, rather than a cable operator or local franchising authority, are entrusted with defining and applying local standards. *See Ballew v. Georgia*, 435 U.S. 223, 241 n. 33, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978) (citation omitted); *Miller*, 413 U.S. at 33–34, 93 S.Ct. 2607. *Cf. Smith v. United States*, 431 U.S. 291, 303–04, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (stating that the question of what constitutes a community's standard regarding obscenity presents issues of federal law "upon which a state statute ... cannot have conclusive effect").