STEPHEN L. MASSAD *v.* EASTERN CONNECTICUT CABLE TELEVISION, INC.
(AC 21726)

Lavery, C. J., and Mihalakos and Bishop, Js.

---

[32] See footnote 23.

Argued March 27—officially released July 2, 2002

*Steven M. Laput*, for the appellant (plaintiff).

*Timothy S. Jajliardo*, with whom, on the brief, was *Peter J. Ponziani*, for the appellee (defendant).

*Opinion*

LAVERY, C. J. In reviewing this appeal from the trial court's rendering of summary judgment in the defendant's favor, we address to what extent federal law shields cable operators from liability for slanderous comments made by individuals on public access cable television shows.

The plaintiff, Stephen L. Massad, brought a three count complaint grounded in common-law tort against the defendant, Eastern Connecticut Cable Television, Inc. The complaint alleged that by not prohibiting a telephone caller on consecutive live broadcasts of a public access show from making slanderous statements about the plaintiff, the defendant was liable under the theories of negligence, recklessness and slander per se. The court granted the defendant's motion for summary judgment, concluding that the action was barred by the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 et seq. We affirm the judgment of the trial court.

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. Although a negligence claim generally is ill suited to summary adjudication; see *Henriques* v. *Magnavice*, 59 Conn. App. 333, 335–36 n.2, 757 A.2d 627 (2000); there is an exception to the general rule where the defendant enjoys immunity. See *Ascuitto* v. *Farricielli*, 244 Conn. 692, 711, 711 A.2d 708 (1998) (affirming grant of summary judgment on negligence claim where parental immunity applied). In determining a motion for summary judgment, the court may rely on "affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like." Practice Book § 17-45.

That evidence reveals the following. The plaintiff owns an insurance business in the New London area. On consecutive weeks in March, 1999, a call-in program, "Views from the Edge of the Field," was broadcast live over the public access channel provided by the defendant that serves the greater New London area. On both occasions, the shows broadcasted comments from anonymous callers who made statements about the plaintiff that he alleged constituted slander per se,

although he also alleged that he suffered actual damages.

"On appeal, [w]e must decide whether the trial court erred in determining that there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . Because the trial court rendered judgment for the [defendant] as a matter of law, our review is plenary and we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Kronberg* v. *Peacock*, 67 Conn. App. 668, 672, 789 A.2d 510, cert. denied, 260 Conn. 902, 793 A.2d 1089 (2002).

The plaintiff has two bases for his appeal. First, he argues that the court misapplied the standard for deciding a summary judgment motion and improperly found facts. Second, he argues that the court misapplied federal law in concluding that the defendant was immune from suit. We disagree with both contentions.

I

The plaintiff first argues that the court improperly assumed the role of fact finder and then concluded that there were no issues of material fact. Specifically, he cites three findings that he argues should have been determined by a jury: That the defendant was solely a cable operator rather than a cable programmer; that the defendant took a more active role in producing the show than simply "carrying" it; and that the defendant provided more than technical assistance. We conclude that the court properly interpreted the relevant statutes.

"In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the

absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle [it] to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal quotation marks omitted.) *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 550, 791 A.2d 489 (2002).

Despite the plaintiff's protestations, we agree with the court's observation that the "parties do not so much appear to differ on the facts," but on the application of the law to those facts. The defendant sought summary judgment largely based on the deposition of Mary Jane Rickard, the defendant's public access coordinator. Rather than introduce contrary evidence through depositions or affidavits; see Practice Book § 17-45; the plaintiff argued that Rickard's deposition showed that the defendant was intimately involved with the production of the show and was, therefore, liable. The court agreed with the defendant's contrary assertion. "The question of whether a particular statute or regulation applies to a given state of facts is a question of statutory interpretation . . . . Statutory interpretation presents a question of law for the court." (Internal quotation marks omitted.) *Biller Associates* v. *Rte. 156 Realty Co.*, 52 Conn. App. 18, 26, 725 A.2d 398 (1999), aff'd, 252 Conn. 400, 746 A.2d 785 (2000). The court, therefore, had the power to interpret the statutory and regulatory language in light of the undisputed facts before it, and we conclude that it did not make improper factual findings.

Despite framing the issue as one where the court improperly found facts, the plaintiff in effect challenges the court's conclusions of law on those issues. The disposition of all of those claims turns on whether the defendant exercised editorial control over the broadcasts or merely provided technical assistance. The court

properly concluded that the defendant provided technical assistance.

Our agreement with the court is based on our interpretation of the relevant state and federal statutes. In doing so, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Furthermore, it is an elementary rule of statutory construction that we must read the legislative scheme as a whole in order to give effect to and harmonize all of the parts. . . . When statutes relate to the same subject matter, they must be read together and specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Citations omitted; internal quotation marks omitted.) *Coregis Ins. Co.* v. *Fleet National Bank*, 68 Conn. App. 716, 720, 793 A.2d 254 (2002).

Section 558 of title 47 of the United States Code provides in relevant part: "Nothing in [47 U.S.C. § 521 et seq.] shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State, or local law of libel, slander . . . or other similar laws, *except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use . . . or under similar arrangements unless the program involves obscene material.*" (Emphasis added.) The plaintiff argues that although the defendant is a cable operator, "its extensive participation in the production, editing, preparation and broadcast of the public access shows" meant that

it also served as a programmer. Because 47 U.S.C. § 558 does not exempt cable programmers of public access shows from liability, the plaintiff argues that the court improperly concluded that the defendant was immune from suit.

The defendant urges us to decline to review the operator-programmer distinction, arguing that the plaintiff did not raise it before the trial court. Practice Book § 5-2 requires that "[a]ny party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief . . . or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. . . ." In the past, we have considered claims that were "perhaps less than clear when raised on the record," so long as they were distinctly raised in the posttrial brief. *Biller Associates* v. *Rte. 156 Realty Co.*, supra, 52 Conn. App. 24. Our review of the transcript of the hearings on the summary judgment motion[1] and the plaintiff's memorandum of law in oppo-

---

[1] In the first oral argument before the trial court on the defendant's motion for summary judgment, the parties engaged in the following colloquy:

"[Defendant's Counsel]: [The plaintiff's] counsel also argues that there is a duty owed because they participated in the broadcasting. . . . [T]hey have to provide these studios and they also supply employees to help run the cameras, to run the control room; they may not have to do that. I'm not even sure about that, Your Honor, if they have to or they don't have to, but I don't think it makes any difference because they're not exerting any control . . . . I don't believe because they're in the studio running some of this equipment that now develops a duty.

\* \* \*

"[Plaintiff's Counsel]: Our third argument is that they actively engaged in the preparation, production and the broadcast of the shows. At bar, this was brought out particularly in [the deposition of] Mary Jane Rickard . . . in her testimony when she says she undertook personally, herself and another volunteer who was employed by [the defendant], to answer phones, man cameras, put phone callers through to the host, character generation, etc., etc. I asked her if anybody else was present on the show besides the host of the show . . . who was on the set. She said, 'No, nobody whatsoever,'

sition to that motion[2] leads us to conclude that the

just the host, her and another volunteer.

"Regulations say that [the defendant] needs to coordinate and they need to provide technical support for the host of the show; however, they engaged in an active participation by answering phones and by monitoring cameras and by switching and by character generation, etc., etc. So, it's their claim that they can't do anything personal to the statute as far as editing or controlling, but yet they participated in the very shows at issue, which . . . I would certainly say that goes beyond control.

\* \* \*

"[Defendant's Counsel]: Lastly, the argument as to technical support. Counsel says—claims that since they were actively engaged, Your Honor, they were giving technical support specifically, in the statute, as plaintiff's counsel stated, requires they provided the control room, and they specifically ran the switching of the cameras, they answered the phone lines and told the host, Kathleen Mitchell, when a call was in. That's all they did."

Similarly, at the second summary judgment hearing, the parties engaged in the following colloquy:

"[Plaintiff's Counsel]: Furthermore, [47 U.S.C. § 558]. Apparently, what the statute is trying to do, it is trying to provide insulation to cable programmers or cable operators from liability. . . . In other words, what the statute contemplates is, it contemplates someone going on a show and somebody saying something that is slanderous . . . and then being able to go after the cable company. And I believe that that is a proper interpretation of what the statute contemplates to limit the liability of cable operators from.

"However, in the case at bar, the defendant actually participated in the broadcast. They were the ones who answered phones, they were the ones who operated cameras, they are the ones who operated the soundboard, they are the ones who generated characters necessary for the broadcast of the said show. For that reason, because they were active participants in the show, it only follows that they should be liable for any conduct which was under backing of them, be it intentional or not intentional.

"This participation in the broadcast would pull their conduct outside of the conduct that is contemplated by § 558 and hold them liable.

\* \* \*

"[Defendant's Counsel]: As far as plaintiff's argument about [the defendant's] role in the broadcast, they are required to give technical support, and . . . [t]hey were just there aiding, as they were required to do, and I don't believe that creates any sort of duty."

[2] The plaintiff's memorandum of law in support of his objection to the defendant's motion for summary judgment states in relevant part:

"The defendant, Eastern, is liable to the plaintiff, Massad, as the defendant was actively engaged in the preparation, production, broadcast and distribution of the alleged defamatory programming.

"Throughout the memorandum of law submitted by the defendant, Eastern argues the position that there is just nothing that can be done with respect

plaintiff adequately raised the claim that 47 U.S.C. § 558 did not shield the defendant from liability. That also was recognized by the trial court, which stated in its memorandum of decision that "[a]ccording to the plaintiff, [the defendant's] employees went far beyond the required level of support and participated in the actual preparation, production, editing and broadcasting of the public access show in question," and that the plaintiff distinguished 47 U.S.C. § 558 by "argu[ing] first that the active participation in the production and broadcast of this program by [the defendant's] employees preclude giving [the defendant] 'blanket immunity' under the statute . . . ." Accordingly, we review the merits of the plaintiff's claim.

Section 522 (5) of title 47 of the United States Code defines a "cable operator" as "any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system . . . ." Although 47 U.S.C. § 522 does not define a "cable programmer," H.R. Rep. No. 98-934, 98th Cong., 2d Sess. 95 (1984), reprinted in 1984

to interfering with the broadcast or the exertion of editorial control over the public access shows. This position, however, allows [the defendant] to turn a blind eye and refuse to accept the responsibility for its part in actually preparing, producing, editing and broadcasting the shows. The plaintiff, Massad, argues that the defendant, Eastern, is liable, as [the defendant] itself has voluntarily participated in the defamatory broadcasts making the defendant's main argument of having no authority to exert editorial control over the shows of public access users moot."

Similarly, the plaintiff made many of the same arguments in his supplemental memorandum of law under a heading that states:

"Although the defendant argues that 47 U.S.C. § 558 is applicable and insulates the defendant from liability, said statute does not contemplate the plaintiff's allegations that the defendant not only carried the subject program, but also participated in the production, broadcast and transmission of the subject program."

U.S.C.C.A.N. 4732, which was adopted as the official legislative history, provides that "[c]able programmers shall include all parties that exercise control over the content of programs . . . ." We conclude that the defendant was not a programmer because it did not exercise control over the shows' content. First, it is the intent of Congress and our state legislature that cable operators generally be prohibited from exercising editorial control over public access programming. See 47 U.S.C. § 531 (e) ("[s]ubject to section 544 (d) of this title,[3] a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity"); House Rep. No. 98-934, supra, 47 ("[t]he [Energy and Commerce Committee of the United States House of Representatives] believes that it is integral to the concept of the use of [public access] channels that such use be free from any editorial control or supervision by the cable operator"), reprinted in 1984 U.S.C.C.A.N. 4684; Regs., Conn. State Agencies § 16-333-33a (b) ("[n]o company shall exert editorial control over the content of [public access] programming").

We conclude that the court properly determined that the defendant acted consistently with that prohibition. The plaintiff argues that the defendant was a programmer because the show literally could not have gone on without the defendant's assistance. Indeed, Rickard testified that Kathleen Mitchell, the show's host, did not provide anyone to work on the set, and that Rickard and others employed by the defendant switched the audio, answered the telephones and generated characters for the broadcasts, a level of involvement that the

---

[3] The plaintiff argues that 47 U.S.C. § 544 (d) imposes liability on the defendant. We disagree and address the merits of that claim in part II B.

plaintiff alleges is contrary to the defendant's own regulations filed with the state department of public utility control (department).[4]

Despite that assistance, the defendant did not exercise control over the content of the show. Rickard testified that the defendant did not screen any telephone calls coming in to the live .shows because "[w]e have no editorial control nor censorship of the content of the shows produced at the studios . . . ." Once the calls were transferred to the show's host, the defendant "ha[s] no way of terminating them," and it was its policy not to because it "ha[s] no editorial control nor censorship of the content of the show; therefore, we cannot control the content of the show."

Rather, the defendant provided technical assistance, as required by § 16-333-33 (b) of the Regulations of Connecticut State Agencies. Although the plaintiff correctly notes that § 16-331a-11 (b) requires operators to train interested persons how to produce community access programs, there is nothing in the regulations to suggest that this training relieves the operator of its obligation to provide technical assistance. Accordingly, we conclude that the court properly determined that the defendant was a cable operator providing technical assistance.

## II

Attempting to defy the plain language of the statute, the plaintiff next challenges the court's conclusion that 47 U.S.C. § 558 immunized the defendant from suit. First, he argues that the statute does not apply because the defendant was a "gratuitous actor" that negligently provided telephone lines even though it was not required to do so. Second, the plaintiff argues that 47

---

[4] According to the defendant's "Public Access Channel Goals and Procedures," which it filed with the department, a producer "must provide [its] own crew (minimum 2) for production of each show."

U.S.C. § 544 (d) imposes liability on the defendant. We are not persuaded.

## A

As we noted in part I, § 558 of title 47 of the United States Code provides in relevant part that "cable operators *shall not incur any such [criminal or civil] liability* for any program carried on any channel designated for public, educational, governmental use . . . or under similar arrangements unless the program involves obscene material." (Emphasis added.) We concluded in part I that the defendant was a cable operator. The plaintiff argues that this immunity applies only to cable operators that strictly comply with federal and state law and regulations. Because the defendant was not required to provide telephone lines, the plaintiff argues that by voluntarily doing so, it became liable for the comments broadcasted on the shows in question. We disagree.

Section 16-331a-11 (c) of the Regulations of Connecticut State Agencies requires that cable systems with more than 3500 subscribers provide an "equipped studio" for public access. The parties agree that the defendant was required to provide an equipped studio. The definition of "equipped studio" in § 16-333-31[5] makes

---

[5] Section 16-333-31 (8) of the Regulations of Connecticut State Agencies provides: " 'Equipped studio' for the purposes of Section 16-331a-11, shall mean the following:

"(1) (A) a production room with ceiling height adequate to mount lighting equipment necessary for good quality production of video programming;

"(B) two cameras having a minimum 350 lines of horizontal resolution and equipped with studio view finder, external synchronization capability and remote lens control;

"(C) lighting equipment, microphones, intercom system, tripods, and microphone mixers sufficient for good quality production of video programming;

"(2) (A) a control room, separate from the production room with adequate sound insulation and space and cable casting equipment sufficient to enable the good quality production and effective showing of video programming, including, but not limited to, the following equipment: three color capable video tape recorders, with video output jack, minimum 60 minute recording

no mention of telephones, telephone assistance or access to live telephone calls, and the defendant admitted in its answer that it voluntarily provided such equipment. Because telephones are not required under 47 U.S.C. § 558, the plaintiff opines, without support, that this "gratuitous conduct fell outside the conduct contemplated" under the blanket immunity in 47 U.S.C. § 558. Furthermore, the plaintiff argues that the defendant, by installing the telephones, was *required* to exercise editorial control, such as a "kill switch" or a delay system, to prevent slanderous remarks from being broadcast.

Not only is the plaintiff incorrect in his assertion that 47 U.S.C. § 558 limits immunity to operators that strictly comply with state regulations, but state regulations encourage operators to provide levels of support that exceed the statutory minimum. See Regs., Conn. State Agencies § 16-331a-12 ("[t]he [department] shall review each company's support, according to the standards set in section 16-331a-11, and may adjust the level of support below such standards if the following so warrant an adjustment . . . (7) The existence of an agreement by the company to provide a level of support higher than that set by the standards in section 16-331a-11").

Equally meritless is the plaintiff's contention that an operator that provides a higher level of support is required to exercise editorial control. As we discussed in part I, the law is clear that cable operators generally

time, minimum 240 lines of resolution, and minimum of two audio tracks, at least two of which must be capable of forming an editing system with a controller, and capable of assemble and insert edit;

"(B) two monitors with a minimum of nine inch screens; switching equipment and a sixteen-page character generator;

"(C) an editing room, separate from the production and control rooms, unless the room is of sufficient size to provide for the editing and control functions to occur simultaneously in the same room without adverse impact to either function, with space and equipment sufficient to enable the effective editing of programming."

should not exercise editorial control. In fact, a cable programmer very well could have a cause of action against a cable operator that exercises editorial control over the programmer's public access show. See *McClellan* v. *Cablevision of Connecticut, Inc.*, 149 F.3d 161, 165 (2d Cir. 1998) (producer of public access show has implied private right of action through 47 U.S.C. § 531 (e) against cable operator who exercises editorial control). Accordingly, we conclude that 47 U.S.C. § 558 provides immunity for cable operators for slanderous remarks made on public access shows.

## B

The plaintiff finally argues that the court improperly concluded that 47 U.S.C. § 544 (d) did not require the defendant to exercise editorial control over the broadcast. We disagree.

As we discussed in part I, § 531 (e) of title 47 of the United States Code provides that "[s]ubject to section 544 (d) of this title, a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." Section 544 (d) (1) of title 47 of the United States Code provides that "[n]othing in [47 U.S.C. § 521 et seq.] shall be construed as prohibiting a franchising authority and a cable operator from specifying, in a franchise or renewal thereof, that certain cable services shall not be provided or shall be provided subject to conditions, if such cable services are obscene *or are otherwise unprotected by the Constitution of the United States*." (Emphasis added.) Slander is speech that falls outside the protection of the first amendment. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 504, 104 S. Ct. 1949, 80 L. Ed. 2d

502 (1984). In addition to that statutory provision, the defendant's "Public Access Channel Goals and Procedures," filed with the department provides that "[t]he channel is not available for language or material, direct or indirect . . . (c) obscene, indecent, profane, *slanderous*, libelous, inflammatory, or invasion of privacy." (Emphasis added.) Because the defendant's material filed with the department stated that its channel was not available for slanderous statements, the plaintiff argues that the defendant could have exercised editorial control over such material.

The court disposed of that argument by distinguishing between prospective and retroactive enforcement. That is, "when prospective public access users apply for air time, it is permissible to enforce the 47 U.S.C. § 544 (d) considerations in deciding whether to allow the applicants public access air time. But the cable operator would not have the right to exercise 'editorial control' over a show that had actually been permitted to run or was in progress or on tape . . . ."

We need not reach that issue at this time. Even if the plaintiff is correct in his assertion that the defendant could have exercised editorial control under federal law, there is nothing to say that it had a duty to do so. As a result, the court properly concluded that the defendant was entitled to judgment as a matter of law.

The judgment is affirmed.

In this opinion the other judges concurred.