**Richard RHAMES, Plaintiff**

v.

**CITY OF BIDDEFORD, Defendant**

**No. CIV. 02–112–P–H.**

United States District Court,
D. Maine.

May 24, 2002.

**46**

David A Lourie, Esq, Cape Elizabeth, ME, for Plaintiff.

Henry B. Center, II, Esq., Smith Elliott Smith & Garmey, P.A., Saco, ME, for Defendant.

## ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

HORNBY, Chief Judge.

The plaintiff has requested a temporary restraining order. The issue is whether I should order the City of Biddeford to reactivate its public access cable television channel so that Biddeford citizen Richard Rhames can resume his broadcasts on the channel. By ordinance, Biddeford has discontinued all broadcasts. It says that it is doing so only temporarily, so that it can improve its access rules in light of court challenges. Plaintiff Rhames asserts that the real reason for the shutdown is that the City Council is unhappy with the broadcasts he and at least one other private producer have been airing. He contends that the ordinance is a direct infringement of his First Amendment right to free speech. Because Biddeford has no obligation to operate a public access channel, I find that the plaintiff has not shown a likelihood of success on the merits of his claim. I therefore deny the request for a temporary restraining order.

### BACKGROUND

Biddeford's procedures for allowing private citizen broadcasts over its public access cable channel are already under attack in this court. Some months before the recent shutdown, Dorothy Lafortune sued the City in October, 2001, challenging its refusal to continue broadcasting her program. *Lafortune v. City of Biddeford,* No. 01–250–P–H (D. Me. filed Oct. 16, 2001). At the hearing on her motion for a temporary restraining order, I expressed serious doubts over whether the City then had properly adopted the procedures it purported to follow in dealing with Ms. Lafortune. I gave the parties an opportunity to reach a compromise over the emergency relief issue so that they could devote their energies to preparing for and litigating the underlying merits of their dispute. The City agreed to stay the ban resulting from Ms. Lafortune's alleged violation of the User's Agreement until the merits of the claim were resolved.

The Lafortune case accordingly proceeded along the ordinary course for reaching trial. On April 30, 2002, Magistrate Judge Cohen issued a recommended decision. He recommended that I uphold some of Biddeford's public access procedures, but also recommended that I invalidate Biddeford's requirement that producers obtain written releases from any private citizen mentioned during a broadcast. *Lafortune v. City of Biddeford,* No. 01–250–P–H, 2002 WL 823678 at *8 (D.Me. Apr. 30, 2002). Following that ruling, the City adopted a new ordinance on May 13, 2002, the subject of this lawsuit:

> WHEREAS, the City of Biddeford currently provides a public access channel to all citizens which allows unlimited ac-

cess to all city video equipment, training and channel time on a first come, first served basis for programming on any issue; and

WHEREAS, the Biddeford City Council finds that the existing terms set forth in the City's Cable Television Ordinance and the terms set forth in the current Producer's Agreement are inadequate to complete the communities objectives of the Public Access Television Center and Programming.

THEREFORE, BE IT ORDAINED, by the Biddeford City Council that the following Ordinance is hereby adopted as an emergency ordinance:

Article VI Cable Television Committee, Section 2–414 Moratorium. The current inadequacies of the provisions set forth in Sections 2–404, 2–406, 2–407, 2–408, 2–409, 2–413 are inadequate and ineffective to operate the City's Community Access TV Center. The aforementioned sections are hereby suspended and all public access operations regarding the City of Biddeford's Community Access Television Center are terminated, pending the Council's adoption of new terms for the Ordinance relating to the use, operation and production of public access programming. It is the intention of the Biddeford City Council to promptly resume public access programming.

Compl. (Ex. C). As a result of the May 13 vote, *nothing*—not even Council meetings—can be broadcast on the public access channel. According to the Verified Complaint, all that can be seen on the channel is continuous broadcast of the following text:

PRESS RELEASE

Due to the increased number of legal and community concerns surrounding the operations of the public access station, your elected officials have opted to establish an emergency moratorium and close down all programming. This moratorium will not only affect the area programming of private producers, but will include all governmental and educational productions.

Within the past year, a number of new programs have been added to the existing live airing of governmental meetings. As the expansion of programming has taken place, the Cable TV Ordinance, which establishes regulations and operational structure of all programming, has not been upgraded to reflect the legal needs of the community.

As your elected officials, we believe it is necessary to respond to the many requests from our constituents on our responsibility to develop clearer regulations. Our decision to enact an emergency order was the result of the recent court recommendation that indicated we needed to clarify our operation of the access station through our ordinance. To eliminate any new concerns or misunderstandings, we have opted to start at the beginning and stop all programming. By establishing this moratorium, we are treating all users equally and fairly.

The Cable TV Committee will have an emergency meeting on Wednesday, May 15th, at the J. Richard Martin Community Center. The meeting location will be posted in the entranceway. The meeting will develop structure to those areas that need to be addressed first as well as how we can begin to structure the operations of the Cable Access Station to reflect the needs and desires of our community.

Sincerely, Mayor Donna J. Dion on behalf of the City Council

Compl. (Ex. D). The plaintiff Richard Rhames, a citizen of Biddeford who broad-

casts his views over the public access channel from time to time, thereupon filed this lawsuit on Friday May 17, 2002. Because he sought emergency relief and because First Amendment issues were at stake, I convened a hearing that Friday afternoon before the City had the opportunity to respond in writing. At the hearing, the City's lawyers were present, as was Mr. Rhames with his lawyer. I heard their arguments, but delayed decision until I could read the parties' filings and the caselaw they cited. I gave the City until 9:00 a.m. on Monday, May 20, 2002, to file any written response to the motion. The City timely filed a responsive brief.

Rhames asserts that the Biddeford broadcasting moratorium is not a good faith attempt to reform the City's public access procedures to meet legal concerns. Pl.'s Mot. for TRO at 3–4. According to Rhames's verified complaint and accompanying documentation, the city councilors are simply unhappy with the things he and Ms. Lafortune have been saying in their broadcasts. Compl. at 4–5. He says that, rather than permit such broadcasts to continue, the councilors decided to shut the channel down—or at least to use the moratorium time to find ways to stifle free speech in a way that they could better defend in court. *Id.* To support his interpretation of the events, Rhames states that Councilor Grattelo criticized as unpatriotic a Rhames broadcast following the events of September 11, 2001, *see id.* at 2; that the moratorium ordinance was preceded by a proposal (never adopted) to limit public access programs to those that directly relate to Biddeford and to establish qualifications for the producers of public access programs, *see id.* at 2–3; and that following adoption of the moratorium, Councilor Grattelo (who is also chair of the Biddeford Cable Television Committee) stated that the purpose was to devise "new rules so that viewers would not have to change the channel to avoid being offended by what they see on public access." *Id.* at 5.

## ANALYSIS

In this opinion, I am not resolving the merits of the dispute between Rhames and Biddeford. Instead, on a motion for a temporary restraining order I assess four factors: (1) the *likelihood*, not certainty (full development of the record can alter the prediction) that the plaintiff will ultimately succeed on the merits; (2) irreparable harm to the plaintiff; (3) harm to the defendant; (4) the public interest. *New Comm Wireless Services, Inc. v. Sprint-Com, Inc.,* 287 F.3d 1, 8–9 (1st Cir.2002). Since First Amendment interests are at stake, the last three factors generally favor the plaintiff. I address only the first factor, likelihood of success.

Unfortunately, the proper way to assess the validity of a municipal shutdown of a public access cable television channel in First Amendment terms is uncertain. Lower courts confronted with similar issues generally have used what lawyers and judges call "forum" analysis.[1] *See, e.g.,*

---

1. Under "forum" analysis, there are three kinds of forums: the traditional "public forum" (including streets, parks and other public places historically used for assembly and debate); a "designated public forum" where the state has opened other public property to expressive activity; and the "nonpublic forum." *Perry Educational Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Some lower courts have treated public access channels as designated forums. *Missouri Knights of the Ku Klux Klan v. Kansas City,* 723 F.Supp. 1347, 1351–52 (W.D.Mo.1989); *Bunton v. City of Palestine,* No. 99–CV–605 (E.D. Tx. June 15, 2002). Government regulation of traditional public forums and designated public forums is reviewed under the same standard. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948. In cases involving regulation of a public fo-

*Jersawitz v. People TV,* 71 F.Supp.2d 1330, 1341–42 (N.D.Ga.1999); *Britton v. City of Erie,* 933 F.Supp. 1261, 1268–69 (W.D.Pa. 1995). In other words, they have treated public access television channels like other "forums" where citizens exercise their First Amendment rights. Public parks and public streets were the "forums" where citizens spoke their minds long before electronic media had appeared. For those traditional public forums, the Supreme Court has held that the First Amendment prevents government from censoring speech by citizens, but allows government to enforce content-neutral rules reasonably regulating time, place or manner of speaking—if the rules are narrowly tailored and leave open ample alternative channels for communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In forum analysis, it is said that government does not have to provide the public park (by analogy, the public access channel) in

the first place; but that once it does so, it cannot favor certain speakers at the expense of others. *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 699–700, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J. concurring). In a recent decision, however, the United States Supreme Court has cautioned against mechanically using forum analysis for the fast-changing world of electronic media. *Denver Area Educational Telecomm. Consortium, Inc. v. FCC,* 518 U.S. 727, 739–43, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996); *see also Arkansas Educational Television Comm'n v. Forbes,* 523 U.S. 666, 673, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) ("Having first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical way to the very different context of public television broadcasting."); *Horton v. City of Houston,* 179 F.3d 188, 192–93 (5th Cir.1999).[2] The Court never-

rum—for example, sound levels in a public bandshell—the Supreme Court has asked whether the measure amounts to reasonable rules concerning the time, place or manner of speaking; whether the regulation has a legitimate, content-neutral purpose; and whether the rules are reasonably tailored to the governmental objective and leave open ample alternative channels of communication. *Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746.

2. Among the many difficulties of applying forum analysis to the electronic medium is defining what is the forum. A public park or a public street is a well-defined physical place where citizens can go to speak their minds or hear others speak theirs. What is the forum for the electronic medium? Is it the single public access channel that Biddeford has arranged to have its cable company provide (a forum over time, since only a single program can be aired at any given time on that channel)? Or is it all the cable channels that Biddeford arranges for and permits the cable company to provide? In other words, is the forum the television set in a Biddeford citizen's living room where he or she can chan-

nel surf from program to program looking for the speech that is most appealing? And what of the Internet? The situation is further complicated by the fact that Biddeford now has a second available channel for public access under its agreement with the cable provider. Does that mean that there are two separate forums, each of Channels 2 and 3, or are they to be considered together as one forum? Another difficulty is that the three-part forum categorization that the Supreme Court has used, *see Perry,* 460 U.S. at 45–46, 103 S.Ct. 948 (the traditional public forum like a park or street; the designated public forum where government decides to open a particular facility for expressive activity; and all remaining public property), does not really fit this electronic medium. Certainly public access cable is not a "traditional" forum in the historical sense; it did not exist when parks and streets were first recognized as forums where First Amendment rights were protected. But it is unlike the second category, the designated public forum into which some lower courts have pressed it and unlike the third category, the nonpublic forum, because these latter two generally are dedicated to other purposes before being opened to speech activities. *Wid-*

theless made clear that the First Amendment does protect the right to free expression on public property including public access cable channels. *Denver Area*, 518 U.S. at 742–43, 116 S.Ct. 2374. But it could not muster a majority on the correct way to analyze the question.[3] I proceed to analyze this important controversy in the face of that confusion.

Biddeford argues that the issue is simple: it did not have to direct its public cable operator to provide a public access channel in the first place and it can there-fore shut the channel down; moreover, that a complete shutdown does not favor or disfavor any particular speaker or viewpoint and thus does not violate the First Amendment. In the abstract, Biddeford is correct. Basic First Amendment principles do not prevent a city from closing or selling a public park that used to be a site for free speech.[4] Likewise, the First Amendment does not prevent a city from deciding not to open a public access channel in the first place or to close it later. That much seems clear as a matter of fundamental First Amendment principles.[5]

---

*mar v. Vincent*, 454 U.S. 263, 267–70, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (public university as designated forum); *Lee*, 505 U.S. at 683, 112 S.Ct. 2701 (airport as nonpublic forum). Cable television, on the other hand, is solely and explicitly designed for speech and expression.

**3.** Justices Breyer, Stevens, O'Connor and Souter rejected forum analysis in favor of "closely scrutinizing" the measure, "to assure that it properly addresses an extremely important problem, without imposing, in light of the relevant interests, an unnecessarily great restriction on speech." 518 U.S. at 743, 116 S.Ct. 2374. Justices Kennedy and Ginsburg preferred forum analysis. Justice Thomas, Chief Justice Rehnquist and Justice Scalia concluded that "it is the cable operator, not the access programmer, whose speech rights" were at issue. 518 U.S. at 824, 116 S.Ct. 2374.

**4.** There is an interesting analogy in the equal protection area. The City of Jackson, Mississippi closed down its public swimming pools rather than desegregate them. In *Palmer v. Thompson*, 403 U.S. 217, 227, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the Supreme Court found that the city could constitutionally do so. Justice Hugo Black stated for the majority:

It has not been so many years since it was first deemed proper and lawful for cities to tax their citizens to build and operate swimming pools for the public. Probably few persons, prior to this case, would have imagined that cities could be forced by five lifetime judges to construct or refurbish swimming pools which they choose not to operate for any reason, sound or unsound. Should citizens of Jackson or any other city be able to establish in court that public, tax-supported swimming pools are being denied to one group because of color and supplied to another, they will be entitled to relief. But that is not the case here.

Chief Justice Warren Burger added in concurrence:

[A]ll that is good is not commanded by the Constitution and all that is bad is not forbidden by it. We would do a grave disservice, both to elected officials and to the public, were we to require that every decision of local governments to terminate a desirable service be subjected to a microscopic scrutiny for forbidden motives rendering the decision unconstitutional.

*Id.* at 228, 91 S.Ct. 1940.

**5.** *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1287–88 (10th Cir.1999); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 146 F.Supp.2d 1155, 1166 (D.Utah 2001). There are lower court cases, but not Supreme Court cases, that disagree with this conclusion. *Kansas City*, 723 F.Supp. at 1352 ("A state may only limit a designated public forum if it does so in a manner consistent with the First Amendment."); *Britton*, 933 F.Supp. at 1268–69; *Bunton*, No. 99–CV–605 at 3; *Thomason v. Jernigan*, 770 F.Supp. 1195, 1200 (E.D.Mich.1991) ("If the City Council's action destroys a public forum, it is well within the Court's power ... to invalidate the action."). Some of those cases involved speaker or viewpoint censorship, likely unconstitutional on any reasoning. As to the others, I believe their reasoning ignores the

The Cable Communications Policy Act of 1984 permitted Biddeford to require the cable company to open a public access channel, an educational channel, a government channel, or any combination of these. 47 U.S.C. § 531(b) (1994). Its decision to contract for a public access channel should not require Biddeford to maintain the arrangement with its cable operator permanently.

But outright closure or sale or conversion to another purpose is not what Biddeford has done. Instead, Biddeford has explicitly shut down the public access channel only temporarily, expressing the intent to resume programming "promptly." Compl. (Ex. C). Certainly if Biddeford were to shut down the public access channel temporarily so as to stifle discussion of a particular current controversy, with plans to reopen the channel later after the controversy had subsided, or so as to stifle the particular speech of this plaintiff, that shutdown would be speaker and viewpoint censorship and would violate the First Amendment under any analysis. So regardless of whether forum analysis provides the framework for analysis, I conclude on underlying First Amendment principles[6] that I must assess first wheth-er the plaintiff is likely to be able to prove that Biddeford's moratorium ordinance amounts to improper speaker or viewpoint censorship.

## A. Speaker or Viewpoint Censorship

If my decision on this point were to be based solely upon the comments of certain councilors, Biddeford's ordinance would be in serious jeopardy. If the ordinance were measured by Councilor Grattelo's alleged motives—to make sure that citizens who tuned into the channel would not have to change channels to avoid hearing things that offend them, *see* Compl. at 5—the First Amendment violation would be clear. Because of the First Amendment, citizens *do* hear things that they would rather not hear, and are forced to walk to another part of the park if they do not like what is being shouted from the soapbox, to turn aside if they do not like the handbill pressed upon them on the street, and to change channels or choose different newspapers if they do not like what they see, hear or read. That is what the marketplace of ideas permits; the premise is that any discomfort is worth the benefit of having all ideas expressed and competing for attention.

underlying constitutional principles recognized by the Supreme Court. Unfortunately, the Supreme Court has never addressed a case of outright shutdown of a place for speech, whether it be a park or a public access cable television channel. Statements by individual Justices and by the academic commentators, however, are clear that the First Amendment does not prevent an outright shutdown. *Lee,* 505 U.S. at 699–700, 112 S.Ct. 2701 (Kennedy, J. concurring); Michael C. Dorf, *Incidental Burdens on Fundamental Rights,* 109 Harv. L.Rev. 1175, 1209 n. 143 (1996); Kathleen M. Sullivan, *Unconstitutional Conditions,* 102 Harv. L.Rev. 1413, 1460 n. 193 (1988); David J. Goldstone, *The Public Forum Doctrine in the Age of the Information Superhighway,* 46 Hastings L.J. 335, 401–02 & n. 329 (1995); G. Sidney Buchanan, *Toward a Unified Theory of Governmental* *Power to Regulate Protected Speech,* 18 Conn. L.Rev. 531, 567–68 (1986); *see also Perry,* 460 U.S. at 46, 103 S.Ct. 948 ("Although a state is not required to indefinitely retain the open character of [a designated public forum], as long as it does so it is bound by the same standards as apply in a traditional public forum."); 4 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 20.47, at 589 (3d ed.1999) (quoting *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948).

**6.** *See generally Ashcroft v. American Civil Liberties Union,* —— U.S. ——, 122 S.Ct. 1700, —— L.Ed.2d —— (2002): " '[A]s a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." ' " (citations omitted).

But the Supreme Court has instructed lower court judges *not* to strike down statutes "on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Here Councilor Grattelo is only one of nine City Councilors. The Supreme Court has said: "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it...." 391 U.S. at 384, 88 S.Ct. 1673. The Supreme Court refused to strike down a law which "could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *Id.* Thus, I do not treat Councilor Grattelo's alleged motivations for supporting the moratorium as the measure of the ordinance.

What Biddeford's moratorium ordinance does is clear from its language: it imposes a temporary moratorium on all use of the public access channel while the City takes steps to remedy inadequacies in the public access procedures. Compl. (Ex. C.). Reform of the procedures is a legitimate municipal goal for Biddeford. On its face, this ordinance is content, speaker and viewpoint neutral—all speakers are silenced on all topics, including the Council itself.[7]

### B. Narrow Tailoring

█ If I were applying forum analysis, I would treat the public access channel as a designated public forum and proceed to consider next whether Biddeford's moratorium is narrowly tailored to the legitimate municipal goal. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Once again, the parties disagree. Rhames argues that outright suppression of speech, even a temporary suppression, is hardly "narrowly tailored" to

the legitimate municipal purpose of reforming public access procedures. Biddeford argues that if it constitutionally can shut down the public access channel permanently, it must be reasonable to shut it down temporarily while it attempts to develop improved procedures.

Just as the Supreme Court has not had occasion to address a permanent shutdown of a place for speech, it has not addressed a temporary shutdown. Instead of shutdowns, its cases deal only with restrictions on expression. For example, one case involved a bandshell in New York City's Central Park, where the City wanted both to preserve the adjacent Sheep Meadow for the contemplative purposes to which it was dedicated and to protect Central Park West as a residential area, yet permit the bandshell to be used from time to time for concerts with enjoyable sound for attendees. *Rock Against Racism*, 491 U.S. at 784, 109 S.Ct. 2746. After various failures in addressing the conflicting goals, the City decided to buy its own equipment and hire a professional sound mixer who would be responsible for sound mixing and volume at all concerts, although taking into account the concert sponsor's aesthetic views. *Id.* at 787–88, 109 S.Ct. 2746. In *Rock Against Racism*, the Supreme Court upheld the measure against First Amendment attack by a concert producer, finding that it was content neutral and a reasonable regulation of time, place or manner (manner was the concern) narrowly tailored to the City's legitimate goal, while leaving open ample alternative channels. *Id.* at 803, 109 S.Ct. 2746. Other lower courts have struggled to apply the reasoning of *Rock Against Racism* to shutdowns of electronic media, *see Britton*, 933 F.Supp. at 1268–69, but I conclude that an

---

7. Nothing in the record suggests that during the temporary shutdown a particular controversial topic will fade from view or that Mr. Rhames will lose his ability or desire to produce public access programming.

analysis that works for assessing mixing and decibel levels does not work very well in judging the constitutionality of a temporary but complete closure of a public access channel as we have here.

More importantly, the Supreme Court has never intimated that, if a city decides to close even a traditional public forum like a public park—for, say, six months—thereby ending all expressive activities in the park, and if that temporary shutdown is content neutral, that the "narrow tailoring" and "ample alternative channels" analysis nevertheless applies. It is true that a city should not be able to shut down a park or a bandshell temporarily so as to avoid a particular speech or a particular concert—that is not a viewpoint neutral measure and violates the First Amendment. But a city should be able to close a public park for six months—because of sewage problems or crime or erosion—without worrying whether the shutdown is narrow enough to avoid undue impact on people who want to speak in the park and whether there are ample alternative channels for them. Likewise here for a public access channel, a temporary moratorium should be permitted to survive if the plaintiff cannot show that it amounts to speech or viewpoint censorship. On this record I conclude that despite the alleged motivation of some councilors, Supreme Court precedents on how to judge the constitutionality of legislation make it unlikely that the plaintiff can prove that the Biddeford moratorium accomplishes speaker or viewpoint censorship. Despite the unfortunate language of some Biddeford officials, the ordinance itself is speaker and viewpoint neutral. The temporary moratorium fits within Biddeford's larger power of terminating the public access channel altogether or refusing to open it in the first place.

■ If I am wrong in this analysis and the court of appeals prefers to apply straightforward forum analysis, I observe the following. On "time, place or manner," time—duration—is the key issue here for the narrow tailoring assessment. Biddeford has not done a very good job of providing reasons why speech must stop during its reform efforts. The sorts of reasons I might have expected—not put forward by Biddeford—are excessive time and expense by City administrators in managing the current set of procedures; or libel or privacy lawsuits or serious threats of such lawsuits by the subjects of public access broadcasts. What is not an adequate reason is citizen/viewer complaints that they do not like some of the views expressed on the public access channel. But in its press release, Biddeford does refer to litigation problems the channel has caused. Compl. (Ex. D). Certainly if the current procedures are exposing Biddeford to monetary liability, avoidance of that expense would be a legitimate governmental interest. Neither of the two lawsuits in this court, however, seeks money damages, only injunctive relief. But both lawsuits seek costs and attorney fees. *See, e.g.,* Compl. at 5–6; Third Am. Compl. of Dorothy Lafortune at 15, *Lafortune v. City of Biddeford,* No. 01–250–P–H (D. Me. filed Nov. 27, 2001). I take judicial notice that attorney fees can be substantial—in the tens of thousands of dollars for federal lawsuits—and that Biddeford must pay at least its own lawyers, and perhaps its opponents' lawyers as well, if it is unsuccessful in defending the policies as they now exist. A moratorium of reasonable duration—to avoid continuing litigation—thus appears to be a reasonable regulation of time, narrowly tailored to this objective of preserving the public fisc.

On the record before me, therefore, a temporary moratorium is narrowly tailored

to Biddeford's legitimate interest.[8] But the current state of affairs obviously cannot continue indefinitely. Biddeford must promptly come up with its new rules and re-open the channel, or determine to close it altogether.

#### CONCLUSION

To be clear: (1) I decide only that Richard Rhames has not shown a likelihood of success on the merits, given the limited information I have in the record at this time, not that success is impossible; (2) I am not endorsing the Biddeford moratorium as good judgment or good public policy. I am saying only that Biddeford never had to provide the public access channel in the first place, and it does not appear at this stage of the proceedings to be unconstitutional for Biddeford to shut the channel down temporarily. *See Rock Against Racism*, 491 U.S. at 800, 109 S.Ct. 2746 (" 'The validity of [time, place or manner] regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests' or the degree to which these interests should be promoted.") (quoting *United States v. Albertini*, 472

U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

For these reasons, the plaintiff's request for a temporary restraining order is **DENIED**.[9] **SO ORDERED**.

---

8. If the forum analysis applies, I do not have adequate information on the record to decide whether or not there are ample alternative channels of communication. I do not know the size or the nature of Mr. Rhames's current audience—who is listening—and I do not know what alternatives are available to reach that audience. Moreover, the Supreme Court has never analyzed an "alternative channels" issue in the context of complete closure of a forum. Generally, the Court examines whether the restriction or ban on the speaker's chosen medium of expression precludes his or her ability to communicate the intended message *within the forum*. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 729–30, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). But in *Heffron v. International Society for Krishna Consciousness, Inc.*, where the Court upheld a restriction on Krishna solicitation on a public fair-

ground, although the Court said that access within the forum was "more important," the Court also observed as one factor that "the rule does not prevent ISKON from [soliciting money] anywhere outside the fairground." 452 U.S. 640, 654–55, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

9. In his Complaint and Motion for Temporary Restraining Order, the plaintiff also requests that this court "require the City to broadcast public access programming on [a second public access channel] whenever [the designated public access channel] is unavailable by reason of priority being given to other programming." Pl.'s Mot. for TRO at 5. Given my reasoning, the additional channel is irrelevant.